1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

SAN JOSE DIVISION

11

12
AMERICAN AUTOMOBILE
ASSOCIATION OF NORTHERN
13
CALIFORNIA, NEVADA & UTAH, et al.,

14
                        Plaintiffs,

15
            v.

16
GENERAL MOTORS LLC, et al.,

17
                        Defendants.

Case No. 17-CV-03874-LHK

**ORDER DENYING IN PART AND
GRANTING IN PART MOTION FOR
SUMMARY JUDGMENT**

Re: Dkt. No. 75

18

19
        Plaintiffs American Automobile Association of Northern California, Nevada & Utah and

20
its affiliate A3 Mobility LLC ("Plaintiffs" or "AAA") bring the instant trademark infringement

21
lawsuit against Defendants General Motors LLC and its affiliate Maven Drive LLC ("Maven")

22
(collectively, "Defendants" or "GM"). Before the Court is GM's motion for summary judgment.

23
Having considered the submissions of the parties, the relevant law, and the record in this case, the

24
Court DENIES IN PART AND GRANTS IN PART GM's motion for summary judgment.

I.      **BACKGROUND**

25
    A.  **Factual Background**

26
        This case concerns two competing car share services with similar names. On April 17,

27

28

2017, AAA issued a press release announcing the launch of its "GIG" car share service. GM also developed a car share service called "MAVEN GIG," which AAA asserts AAA did not learn about until May 3, 2017. *See* Opp'n at 1. Viewing the facts in the light most favorable to AAA, the Court discusses the two car share services below. The Court starts with AAA's GIG car share service.

### 1. AAA's GIG Car Share Service

In 2016, AAA created its subsidiary, A3 Mobility, to focus on a new business model innovation for AAA. ECF No. 77-1 ("Haight Decl.") ¶ 7; *see also* ECF No. 77-2 ("Bowler Decl."), Ex. 1 ("Hetke Tr.")[1] at 16:19–25, 24:13–18. In September 2016, A3 Mobility began developing an idea for a car share service, and AAA drafted a business case to present to its executives that identified April 2017 as the launch date. Haight Decl. ¶ 8; Hetke Tr. at 46:6–18, 53:19–54:3, 106:5–12; 138:17–23. AAA hired third-party advertising agency Muhtayzik Hoffer, and with Muhtayzik Hoffer's collaboration, AAA settled on the name ███ with the tagline "Get In. Go." in January 2017. Haight Decl. ¶¶ 9–12; Hetke Tr. at 79:20–80:25. Soon after, AAA learned that ███ was covered by a preexisting third party trademark application, and therefore AAA abandoned ███ and proceeded with "GIG" (the acronym of "Get In. Go."), a mark that AAA's Chief Innovation Officer, Mike Hetke, came up with during a January 27, 2017 meeting. Haight Decl. ¶¶ 13–15; Hetke Tr. at 80:1–25, 82:21–83:25, 85:6–25.

After receiving a clean trademark clearance search yielding no conflicting marks, AAA filed a trademark application for the "GIG" mark with the U.S. Patent and Trademark Office on February 3, 2017 (U.S. Trademark Application Serial No. 87323570). Haight Decl. ¶ 16; Hetke Tr. at 136:10–138:3. On February 24, 2017, AAA submitted a formal application to the City of Oakland as "Gig Car Share" for parking permits. Haight Decl. ¶ 17; *see also* Bowler Decl., Ex. 2. By March 2, 2017, AAA shared the GIG mark with event services vendor Daybreaker, LLC, and

---

[1] AAA cites to excerpts of the Hetke deposition transcript and attaches those excerpts as Exhibit 1 to the Bowler declaration. GM also cites to excerpts of the Hetke deposition transcript and attaches those excerpts as Exhibit 47 to ECF No. 75-3 ("Adkisson Decl."). For simplicity, the Court refers only to the "Hetke Tr." when referring to either, or both, exhibits.

Daybreaker, LLC began planning the official GIG launch event and promoted the event through social media, posters, and direct email. Haight Decl. ¶¶ 18–19; *see also* Bowler Decl., Ex. 3 ("Voges Tr.") [2] at 63:8–65:22. By April 12, 2017, there were over 3,600 RSVPs for the GIG launch event. Haight Decl. ¶ 21; *see also* Bowler Decl., Exs. 4 & 5.

On April 17, 2017, AAA issued a formal press release regarding the GIG launch; launched the GIG website, www.gigcarshare.com; began social media advertising and street team/field marketing; and opened up a GIG early enrollment period that included a targeted e-mail campaign to sign up GIG users. Haight Decl. ¶¶ 22–23; Hetke Tr. at 138:17–140:14, 149:15–25; Voges Tr. at 31:19–33:12, 36:10–37:16, 40:14–25, 41:11–42:9: 90:21–91:3. AAA launched the GIG mobile phone application in app stores on April 17, 2017, and immediately began receiving hundreds of downloads. Haight Decl. ¶ 25. San Francisco-based public media outlet KQED aired a radio interview about GIG with AAA's GIG Car Share President, Jason Haight. *Id.* ¶ 24; s*ee also* Bowler Decl., Exs. 6 & 7. Between April 17, 2017 and April 30, 2017, dozens of AAA employees drove GIG branded cars in public. *Id.* ¶ 26; *see also* Voges Tr. at 68:8–18. By April 28, 2017, there were over 7,000 RSVPs for the GIG launch event. Haight Decl. ¶ 27. When the GIG launch event was ultimately held on April 30, 2017, it was heavily branded with the GIG mark, and there were thousands of attendees. *Id.* ¶ 28; Voges Tr. at 66:20–22; 68:19–70:9.

Within one year of operation, GIG doubled in size from 250 to 500 cars and expanded to serve four cities, including Berkeley, Oakland, Alameda, and Albany. Haight Decl. ¶ 32. AAA publicly announced GIG's expansion into Sacramento in 2019. *Id.* ¶ 34.

### 2. GM's MAVEN GIG Car Share Service

#### a. GM's "Maven" Mark

Maven is an affiliate of GM that provides vehicle-sharing services under its "Maven" mark. ECF No. 1 ("Compl") ¶ 29. GM developed its "Maven" mark in January of 2016. GM

---

[2] AAA cites to excerpts of the Voges deposition transcript and attaches those excerpts as Exhibit 3 to the Bowler declaration. GM also cites to excerpts of the Voges deposition transcript and attaches those excerpts as Exhibit 55 to the Adkisson declaration. For simplicity, the Court refers only to the "Voges Tr." when referring to either, or both, exhibits.

offers rental services through Maven that are labeled with the word "Maven" and another

identifying word. For instance, GM offers rental services targeted toward personal use called

"MAVEN HOME" and "MAVEN CITY" under its Maven mark. Bowler Decl., Ex. 8

("Bhattacharya Tr.")[3] at 33:11–12; *id.*, Ex. 9 ("Stooke Tr.")[4] at 26:21–28:16.

### b. GM's EXPRESS DRIVE Relationship with Lyft

Around the same time that GM developed its Maven mark, GM had a program with Lyft

called "EXPRESS DRIVE" for the use of GM vehicles in providing Lyft services. Bhattacharya

Tr. at 33:19–34:8; Bowler Decl., Ex. 8 ("Steyn Tr.")[5] at 20:11–25:9. Specifically, EXPRESS

DRIVE is a program branded by Lyft whereby Lyft "offers cars through their partners, like Maven

to the drivers exclusively for them to earn money on the Lyft platform." Steyn Tr. at 21:9–12. In

other words, Lyft serves as the direct contact to the drivers. *Id.* at 22:21–25, 52:18–23.

Before the fall of 2016, however, GM's relationship with Lyft and EXPRESS DRIVE

became strained due to unprofitability and unaligned incentives. Bhattacharya Tr. at 50:10–51:6;

Steyn Tr. at 24:16–25:10; 53:18–23. In particular, GM wanted direct contact with the drivers.

Steyn Tr. at 53:18–23. Therefore, in the summer of 2016, GM began exploring an alternative

"platform-agnostic" model where GM would maintain a direct relationship with drivers regardless

of the business partnership. *Id.*; Stooke Tr. at 37:13–38:22.

### c. GM Brainstorms the MAVEN GIG Mark

GM came up with the MAVEN GIG mark idea in early August 2016, when a team of GM

employees brainstormed names for a car rental service for individuals to drive for companies like

---

[3] AAA cites to excerpts of the Bhattacharya deposition transcript and attaches those excerpts as Exhibit 8 to the Bowler declaration. GM also cites to excerpts of the Bhattacharya deposition transcript and attaches those excerpts as Exhibit 3 to the Adkisson declaration. For simplicity, the Court refers only to the "Bhattacharya Tr." when referring to either, or both, exhibits.
[4] AAA cites to excerpts of the Stooke deposition transcript and attaches those excerpts as Exhibit 9 to the Bowler declaration. GM also cites to excerpts of the Stooke deposition transcript and attaches those excerpts as Exhibit 1 to the Adkisson declaration. For simplicity, the Court refers only to the "Stooke Tr." when referring to either, or both, exhibits.
[5] AAA cites to excerpts of the Steyn deposition transcript and attaches those excerpts as Exhibit 10 to the Bowler declaration. GM also cites to excerpts of the Bhattacharya deposition transcript and attaches those excerpts as Exhibit 4 to the Adkisson declaration. For simplicity, the Court refers only to the "Steyn Tr." when referring to either, or both, exhibits.

Case No. 17-CV-03874-LHK
ORDER DENYING IN PART AND GRANTING IN PART MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

Uber or Lyft, who do not own cars or do not want to use their own cars for commercial purposes. ECF No. 75-1 ("Bhattacharya Decl.") ¶ 4; Stooke Tr. at 46:3–5, 48:8–22; Adkisson Decl., Ex. 2 ("5th Resp. to AAA's 1st Interrogs.") at 3–5. The name was based on research by Megan Stooke, the Chief Marketing Officer for Maven Drive, regarding the phrase "gig economy," which is used to describe the trend in the labor market for short-term, freelance work, such as working as a driver for one of the app-based services. Bhattacharya Decl. ¶¶ 6–7; Stooke Tr. at 48:8–22. From that research, the team shared the MAVEN GIG name with GM's advertising agency, Dentsu Aegis Network, on August 8, 2016. Bhattacharya Decl. ¶¶ 6–7; Adkisson Decl., Ex. 5. Management approved the MAVEN GIG mark in mid-September 2016. Bhattacharya Decl. ¶¶ 8–9. GM employees confirmed that the purpose of the MAVEN GIG service was for GM to have a direct relationship with drivers and to have an agnostic platform where drivers could drive for any ride share or delivery business. Strooke Tr. at 38:10–18; Steyn Tr. at 53:18–23.

### d. GM Communicates with Potential Business Partners

Before GM's formal approval of the MAVEN GIG mark, GM used the mark in a few instances to discuss potential partnerships with other businesses. Bhattacharya Decl. ¶ 10. For instance, GM emailed Amazon twice in August and September 2016, to propose a partnership based on the MAVEN GIG service. *Id.* ¶¶ 11–12; Adkisson Decl., Ex. 7 ("8/29/16 Email to Amazon"); *id.*, Ex. 8 ("9/28/16 Email to Amazon") ("For Maven Gig . . . [A] Gig partnership with Amazon wouldn't be a fleet dedicated to Amazon; the concept of Gig is that rideshare drivers can use our car to drive for multiple platforms."); Stooke Tr. 80:14–24.

On September 8, 2016, GM participated in a live WebEx meeting with Uber during which GM proposed a business partnership with Uber. Bhattacharya Decl. ¶ 13. As part of that WebEx meeting, GM emailed Uber a slideshow titled "Maven Gig" (file name "Maven-Gig-Overview_Uber.pdf") that explained the MAVEN GIG service. *Id.* ¶ 13; *see also* Adkisson Decl., Ex. 9 ("9/8/16 Email to Uber"). The slideshow bore both the Maven mark as well as the MAVEN GIG mark.

In September and November 2016, GM also discussed and presented written materials

Case No. 17-CV-03874-LHK
ORDER DENYING IN PART AND GRANTING IN PART MOTION FOR SUMMARY JUDGMENT

about the MAVEN GIG service with an individual name Moshe Cohen from Gravity Technologies as well as the grocery delivery company Instacart. Bhattacharya Decl. ¶¶ 14–16; Stooke Tr. 81:5–12; *see also* Adkisson Decl., Ex. 10 ("9/2016 Emails with Gravity Technologies"); *id.*, Ex. 12 ("11/2016 Instacart Maven Gig Presentation"); *id.,* Ex. 11 ("11/30/16 Instacart Maven Gig Workflow Presentation"). The Instacart presentation predominantly displayed the Maven mark, but also displayed the MAVEN GIG mark. *See* 11/2016 Instacart Maven Gig Presentation.

### e. GM's Pilot Program Partnership with Uber

Both parties agree that GM entered into a partnership with Uber to rent cars directly to Uber drivers. *See* Mot. at 3; Opp'n at 4; *see also* Bhattacharya Decl. ¶ 17. However, GM paints the partnership as the "first business partnership for the MAVEN GIG service," while AAA emphasizes that this was merely a pilot program. *Compare* Mot. at 3–6, *with* Opp'n at 4–7.

The evidence reflects that GM and Uber entered into a three-month "Pilot Agreement" executed on October 31, 2016, that made Uber a rideshare partner. Steyn Tr. at 52:1–18, 97:8–19, 99:22–100:25; *id.*, Ex. 11 ("Pilot Agreement"); Stooke Tr. 39:6–41:3; Bhattacharya Tr. at 53:2–15. Although the Pilot Agreement mentioned Uber and Maven, it did not mention MAVEN GIG. S*ee* Pilot Agreement. The Pilot Agreement provided that Uber had exclusive responsibility to "conduct email marketing of the Program to existing and potential Uber Driver Partners," and that the parties would jointly distribute a press release announcing the launch of the program. Pilot Agreement at GM18110 & GM18121; Steyn Tr. at 103:1–104:22; Bhattacharya Tr. at 26:24–25, 144:15–145:25. The press release went out on November 1, 2016; however, the press release mentioned Uber and Maven but did not mention MAVEN GIG. Bowler Decl., Ex. 12 ("11/1/16 Press Release"); Steyn Tr. at 105:10–107:8; Bhattacharya Tr. at 148:11–150:6. Indeed, GM employees later clarified that this was because GM technically never had a co-marketing agreement with Uber on MAVEN GIG. Bhattacharya Tr. at 255:4–18; Bowler Decl., Ex. 27.

AAA points to evidence in the record demonstrating that GM may have sought to purposefully conceal the MAVEN GIG mark during its pilot with Uber. For instance, the record

demonstrates that GM was particularly sensitive about the Lyft EXPRESS DRIVE partnership, so GM wanted to get "Express Drive unwound" before they got "[MAVEN GIG] up and running," especially because GM had not given Lyft formal notice that GM was exiting EXPRESS DRIVE and especially given the fact that Lyft and Uber were competitors. Steyn Tr. at 55:21–57:25, 89:20-90:20; Bhattacharya Tr. at 148:13–151:4 ("[W]e knew the entire conversation would be about Uber and Lyft, in any case, and that the message we wanted to tell would get lost."); *see also* Bowler Decl., Ex. 15. Moreover, GM wanted MAVEN GIG to be a platform-agnostic, multi-partner product, and knew that if GM "tried to message extensively about the platform agnostic aspects of [MAVEN GIG], the fact that [GM] only had one-co-marketing partner to begin with didn't look great with that." Bhattacharya Tr. at 150:13–151:4. Therefore, GM did not have a marketing campaign or intend to market MAVEN GIG until it had other partners besides Uber, which the evidence in the record suggests did not occur until May of 2017.[6] *Id.* at 59:4–60:8, 156:1–158:18, 214:8–11; *see also* Bowler Decl., Ex. 16. Thus, the MAVEN GIG mark is not mentioned in the media talking points or the official communications plan regarding the Uber pilot. Steyn Tr. at 110:21–112:24; Bowler Decl., Ex. 16 ("Media Briefing Talking Points"); Bhattacharya Tr. at 152:12–155:25; Bowler Decl., Ex. 18 ("Communications Plan").

The car share service rental became available to Uber drivers in San Francisco on November 1, 2016. Bhattacharya Decl. ¶ 18; ECF No. 75-2 ("Jaising Decl.") ¶ 5. That same day, as part of the Pilot Agreement, Uber contacted drivers through a sign-up email to promote the car share service and to explain how to rent a car. Bhattacharya Decl. ¶ 19; Jaising Decl. ¶ 6. The sign-up email from Uber mentioned Uber and Maven but did not mention MAVEN GIG. Bowler Decl., Ex. 14 ("Uber Driver Email"); Bhattacharya Tr. at 113:18–114:22; Stooke Tr. 84:19–85:3. Specifically, the sign-up email stated: "We've teamed up with Maven." *See* Uber Driver Email. The Uber sign-up email contained a hyperlink that led to the landing page at www.mavendrive.com/gig, and an enrollment website at www.mavendrive.com/gig/#!enroll

---

[6] *See supra*, Sections I.A.2.g & i.

Case No. 17-CV-03874-LHK
ORDER DENYING IN PART AND GRANTING IN PART MOTION FOR SUMMARY JUDGMENT

("Enrollment Website"), which directed customers to complete a four-part enrollment form to create an account, provide personal and credit card information, and schedule an appointment to rent a car. Bhattacharya Decl. ¶¶ 19–20; Jaising Decl. ¶ 6; Adkisson Decl., Ex. 13; 5th Resp. to AAA's 1st Interrogs. at 10. Anyone with the hyperlink could access the site; however, the link was only emailed to existing Uber drivers through the Uber email and was not sent to the general public. Steyn Tr. at 95:1–96:20; Bowler Decl., Ex. 19; Bhattacharya Tr. at 26:11–27:15.

The first screen of the Enrollment Website bore the "Maven" mark in large text in the top left corner, but not the "MAVEN GIG" mark. Adkisson Decl., Ex. 14 ("First Enrollment Screen"). The description on the website stated "Welcome to Maven! . . . Once you have completed the registration process, it can take up to 2 business days to be approved." *Id.* As displayed in the image below, however, the "Maven Gig" mark appeared only once, at the bottom of the first screen of the Enrollment Website, where customers were required to check a box next to the statement, "I agree to Maven Gig's Lease Agreement and Privacy Statement." *Id.*; Jaising Decl. ¶ 7.



*See* First Enrollment Screen. The MAVEN GIG check box statement appeared in font smaller than the Maven mark that was used in multiple places on the first screen of the Enrollment Website. *See* First Enrollment Screen. Customers were not permitted to move onto the next screen of the Enrollment Website if they did not check the box acknowledging this statement. *See id.*; Jaising Decl. ¶ 7. Although the statement next to the check box mentioned MAVEN GIG, the lease agreement itself did not display the MAVEN GIG mark and only mentioned Maven. *See* Bowler Decl., Ex. 11 at GM18122–33 ("Maven Program Rental Agreement"); Bhattacharya Tr. at 146:1–147:24; Bowler Decl., Ex. 29 ("Gig Enrollment Flow") at 3.

Case No. 17-CV-03874-LHK
ORDER DENYING IN PART AND GRANTING IN PART MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

All Uber drivers who checked the box received a welcome email prompting verification by clicking on a URL (www.mavendrive.com/gig/#!/emailConfirm/). Jaising Decl. ¶ 8; 5th Resp. to AAA's 1st Interrogs. at 15–18. The welcome email did not mention MAVEN GIG and instead bore only the Maven mark. Gig Enrollment Flow at 7. Drivers were then prompted to complete the next three screens of the Enrollment Website, which required them to enter payment details and driver's license information, and to select a car rental appointment time. Jaising Decl. ¶ 8; 5th Resp. to AAA's 1st Interrogs. at 18–19; Bhattacharya Tr. at 81:16–83:16. The MAVEN GIG mark was not present on any of these screens, and instead the screens showed only the Maven mark. *See* Gig Enrollment Flow at 4–6.

Customers who completed all four screens of the Enrollment Website received an automated reservation confirmation email bearing a large Maven mark header in the body of the email. *See* Adkisson Decl., Ex. 15 ("Confirmation Emails") at GM55933–45. The email's text stated, "Welcome to Maven Gig!" in font smaller than the large Maven mark header. Jaising Decl. ¶ 9; *see also* Confirmation Emails at GM559393–45. The reservation confirmation email also provided directions to a shared parking lot and instructed customers to let the parking attendant know "that you are looking for Maven Gig." Confirmation Emails at GM559393–45. The reservation confirmation email was signed "The Maven Team." *See id.* An example of the reservation confirmation email is presented in the image below.



Case No. 17-CV-03874-LHK
ORDER DENYING IN PART AND GRANTING IN PART MOTION FOR SUMMARY JUDGMENT

After the drivers had enrolled, they could log into their Maven accounts at www.mavendrive.com/gig/#!/login ("Maven Website") and could view and revise their existing reservations or make new ones through their Maven account. Jaising Decl. ¶ 10. MAVEN GIG did not appear on this Maven Website. *See* Bhattacharya Tr. at 181:2–182:21; Bowler Decl., Ex. 20; *id.*, Ex. 21; Steyn Tr. at 91:8–17. However, if customers revised their existing reservations, they received a reservation update email confirming the details for their new reservation that again stated, "Welcome to Maven Gig!" and to let the parking attendant "know that you are looking for Maven Gig." *Id.* ¶ 11; *see also* Adkisson Decl., Ex. 16; *id.*, Ex. 17. Invoices sent to drivers after completed reservations displayed the Maven mark but not the MAVEN GIG mark. *See, e.g.*, Bowler Decl., Ex. 31 (December 2016 emails with attached invoice); *id.*, Ex. 32 (July 2017 emails with attached invoice).

On November 1, 2016, GM recorded its first driver who enrolled and reserved a car on the Enrollment Website. Jaising Decl. ¶¶ 12, 14; Bhattacharya Decl. ¶ 21; *see also* Adkisson Decl., Ex. 18. On November 2, 2016, Akshay Jaising, the Regional Manager – West at Maven Drive, and another GM employee met the first driver to pick up a car rented through the service at a parking lot in San Francisco and provided an overview of how the MAVEN GIG service works. Jaising Decl. ¶ 13; Bhattacharya Decl. ¶ 22.

GM explained that when drivers would go to the parking lot to pick up cars, the parking lot was not generally branded, but employees would typically wear Maven, but not MAVEN GIG, apparel so that the drivers would know with whom to speak. Bhattacharya Tr. at 56:25–12. GM also clarified that the rental cars were branded with the Maven mark but not the MAVEN GIG mark. *Id.* at 137:3–11; *see also* Bowler Decl., Exs. 22 & 23 (showing car with only a "Maven" mark car decal).

Starting November 21, 2016, Uber incorporated a link to the Enrollment Website in its sign-up flow for new drivers in San Francisco on the Uber website, which is available to all members of the public who wish to drive for Uber. *See* Jaising Decl. ¶ 15; *see also* Adkisson Decl., Ex. 19 ("Uber Sign-Up Flow"). The sign-up flow included only the Maven mark, and

clicking on the Maven mark would bring drivers to the Enrollment Website. *See* Uber Sign-Up Flow; *see also* Jaising Decl. ¶ 15.

Beginning as early as January 31, 2017, existing drivers could make new reservations to rent cars on the Maven Website by clicking to expand a section of the website that was specifically titled "Maven Gig." Jaising Decl. ¶ 17; Adkisson Decl., Ex. 21 at GM56459. However, this tab only appears to have been available to drivers who already had a Maven account and had logged in. *See* Jaising Decl. ¶ 17. After clicking the "Maven Gig" tab, customers could follow the listed steps to make a new reservation. Jaising Decl. ¶ 17; Adkisson Decl., Ex. 21 at GM56459.

### f. GM's Communications with Customers

GM highlights that, beginning around December 28, 2016, GM had responded to email inquiries from customers and prospective customers using the MAVEN GIG mark. *See* Jaising Decl. ¶ 16; Bhattacharya Decl. ¶ 24; Bhattacharya Tr. at 60:20–70:5. Specifically, GM cites to evidence in the record that GM used the mark in a few emails to: (1) confirm that customers were interested in GM's "Maven Gig program" (as opposed to GM's other services under Maven); (2) advise customers that their inquiry would be forwarded to GM's "Maven Gig" team; and (3) provide information about the MAVEN GIG service. *See, e.g.*, Adkisson Decl., Ex. 21 (email dated 2/22/2017); *id.*, Ex. 22 (emails dated 1/5/2017–1/6/2017); *id.*, Ex. 23 (email dated 2/8/2017); *id.,* Ex. 24 (email dated 3/15/2017). Nonetheless, GM's emails in response to customer inquiries also frequently used the Maven mark. For instance, GM sent the emails from a Maven email address, such as memberservices@maven.com; GM signed the emails "Maven Member Services"; and GM's emails displayed a prominent Maven mark. *See, e.g.*, Adkisson Decl., Exs. 21 & 23. Further, several of GM's emails referred to the service inconsistently, including "[o]ur program with Uber," "[o]ur Uber program," "[o]ur partnership with Uber." *See, e.g.*, *id.*, Ex. 21; *id.*, Ex. 29.

Additionally, GM cites to evidence showing that GM replied to two customer emails with questions about the car share service by attaching a slide presentation dated January 31, 2017 with the file name "Maven Gig Uber Pilot Highlights.pdf" that displayed the MAVEN GIG mark.

United States District Court
Northern District of California

Jaising Decl. ¶ 17; Adkisson Decl., Ex. 21 (email dated 2/22/2017 attaching PDF); *id.*, Ex. 29 (email dated 3/2/2017 attaching PDF). For example, next to the screenshot showing the Maven Website, the presentation explained: "Once you have logged in, click on Maven Gig and follow the steps to make an appointment." Jaising Decl. ¶ 17; Adkisson Decl., Ex. 21 at GM56459. The presentation also stated: "[t]he Maven Gig program for Uber drivers is currently offered in San Francisco," and to "[s]tay tuned for updates." Jaising Decl. ¶ 18; Adkisson Decl., Ex. 21 at GM56462. However, the PDF presentation that GM sent out also mentions the Maven Website, the "Maven Lease Agreement," Maven insurance, the "Maven vehicle," and the "Maven bill." *Id.*

### g.   GM Continues to Communicate to Potential Business Partners

GM also cites to evidence in the record that GM discussed potential partnerships with other third-party companies in early 2017. Bhattacharya Decl. ¶ 26. For example, GM and Hertz began discussing a potential partnership in mid-February of 2017. *Id.* ¶ 27. On March 29, 2017, GM and Hertz had an in-person meeting, during which GM used a slide presentation. *Id.*; Jaising Decl. ¶ 21; Adkisson Decl., Ex. 30 ("Hertz Presentation"); Bhattacharya Tr. at 70:7–10. The MAVEN GIG mark was on several of the slides; however, many of the slides bore just the Maven mark. *See* Hertz Presentation. GM and Hertz continued their discussions about the car share service in a live WebEx meeting on April 11, 2017. Jaising Decl. ¶ 21.

GM also discussed a potential partnership with the package delivery company Roadie on March 28, 2017 using a presentation titled "Maven GIG overview (Roadie)" that showed both the Maven mark and the MAVEN GIG mark. Bhattacharya Decl. ¶ 28; Adkisson Decl., Ex. 31 ("Roadie Presentation"); Bhattacharya Tr. at 66:12–16. GM also discussed a potential partnership with the food delivery company Grubhub beginning in March 2017. Bhattacharya Decl. ¶ 29; Bhattacharya Tr. at 66:12–16. On April 6, 2017, GM emailed Grubhub a presentation titled "MAVEN GIG OVERVIEW" with the file name "170405_Maven-GIG_Overview.pdf." Bhattacharya Decl. ¶ 29. The presentation showed the MAVEN GIG name several times, including references to the "Maven Gig renter experience" and a proposed co-marketing partnership that showed the MAVEN GIG mark. *Id.*; *see also*, Adkisson Decl., Ex. 32 ("MAVEN

12

GIG OVERVIEW Presentation").

Roadie, Grubhub, and Instacart all eventually became co-marketing partners for the MAVEN GIG service sometime in April 2017, after AAA's April 17, 2017 launch; however, the exact dates of those partnerships are not clear from the record. Bhattacharya Decl. ¶¶ 30–31; Bhattacharya Tr. at 47:9–49:7. GM employees explained that these additional partnerships between GM and companies such as Grubhub, Instacart, Roadie, and other ridesharing services to provide vehicles to use for independent driving gigs meant GM had achieved its goal of making the MAVEN GIG service "platform-agnostic." Bhattacharya Decl. ¶ 32; Jaising Decl. ¶ 28.

### h. GM's Customer Statistics

By April 17, 2017, the date AAA issued a formal press release regarding the GIG launch, GM had received 2,340 applications from prospective drivers who had visited the Enrollment Website and had checked the box next to the statement "I agree to Maven Gig's Lease Agreement and Privacy Statement"). Jaising Decl. ¶¶ 14, 23–24; Adkisson Decl., Ex. 18; *id.*, Ex. 34 ("Customer Data"). GM also asserts that it had sent over 846 reservation confirmation emails to customers, but this figure is not supported—or at the very least made clear—by GM's citations to the record. *See* Mot. at 8 n.45.

By April 17, 2017, the number of "members" of the MAVEN GIG service, which refers to GM's way of counting the number of customers who have either completed or have an in-progress service rental, was 284 customers. Jaising Decl. ¶ 23; *see also* Customer Statistics. From November 2016 until April 1, 2017, GM collected approximately ███████ in revenue from the car share service. *See* Adkisson Decl., Ex. 20 ("Maven Gig Billing Collections").

### i. GM's Use of the MAVEN GIG Service After April 17, 2017

GM contends it first learned about AAA's GIG mark through an article published on April 17, 2017. Bhattacharya Decl. ¶ 35. After that date, on May 2, 2017, GM launched a new website for the MAVEN GIG service and published the "Maven Gig Insurance Policy for Commercial Lease/Rental Agreement" online at: http://media.gm.com/media/us/en/maven/gig-insurance.html. Jaising Decl. ¶ 27; *see also* Adkisson Decl., Ex. 41 ("Maven Gig Insurance Policy").

On May 3, 2017, GM issued a press release titled "Maven Gig Accelerates the Freelance Mobility Economy," in which GM announced that "Maven is expanding its flexible mobility platform to accelerate the gig economy." Adkisson Decl., Ex. 42 ("5/3/2017 MAVEN GIG Press Release"). Evidence in the record suggests that GM issued this press release because the MAVEN GIG service was technically not yet public at that time. Bhattacharya Tr. at 190:7–14, 192:23–193:9; Bowler Decl., Ex. 24 ("Note that Gig isn't technically public yet"); *id.*, Ex. 25 (4/17/2017 email stating "we aren't announcing the Gig business until 2 weeks from now."); *id.*, Ex. 26 (2/25/2017 emails stating "I just wanted to make sure we were on the same page in respect to communications. The direction is to NOT make a lot of noise around the Australian Maven Gig partnership with Uber in March. So please, do not issue any press releases" and that "we are 100% aligned on not doing anything external during our pilot.").

The press release stated that "Maven Gig drivers are provided access to vehicles they can use for independent gigs that they choose, such as package delivery, food or grocery delivery, and ridesharing." 5/3/2017 MAVEN GIG Press Release. "This program is live in San Diego and will launch in San Francisco and Los Angeles later this year."[7] *Id.* "Initial partners include GrubHub, Instacart, Roadie and ridesharing services." *Id.* The press release further stated that "Maven's internal data shows a clear, growing need for Maven Gig"; that "Maven's on-demand rental for ridesharing program has produced more than 100 million miles driven and 9.3 million rides have been given"; and that "Maven has applied learnings from these operations to launch Maven Gig and help make the sharing economy more accessible and intelligent." *Id.* The press release generated publicity, including third-party articles that referred to the service as "Maven Gig." Bhattacharya Decl. ¶ 32; *see also, e.g.*, Adkisson Decl., Ex. 43 (5/3/2017 *Los Angeles Times* article titled "GM introduces 'Maven Gig' rental program for app-based freelance drivers").

---

[7] It is not clear why this discrepancy exists between the May 5, 2017 press release, which states that the MAVEN GIG service is live in San Diego and "will launch in San Francisco . . . later this year," and the declarations that suggest that the Uber pilot program launched in San Francisco on November 1, 2016. *Compare* 5/3/2017 MAVEN GIG Press Release, *with* Bhattacharya Decl. ¶ 18; Jaising Decl. ¶ 5. This evidence may further corroborate the private nature of the Uber pilot program.

Case No. 17-CV-03874-LHK
ORDER DENYING IN PART AND GRANTING IN PART MOTION FOR SUMMARY JUDGMENT

After May 3, 2017, GM used the MAVEN GIG mark in paid search marketing. Stooke Tr. at 102:11–13. GM also started a MAVEN GIG Facebook community, created MAVEN GIG marketing materials that are located on YouTube and "created digital assets for Maven Gig members to refer to other members." *Id.* at 102:11–20, 103:19–105:18. MAVEN GIG has expanded since its initial launch and is currently available in Austin, Detroit, San Diego, San Francisco, Los Angeles, Phoenix, Boston, Baltimore, Washington, D.C., and New York. Bhattacharya Decl. ¶ 33. MAVEN GIG was not introduced to the Maven app until August 2017. Stooke Tr. at 126:10–12.

GM has earned approximately ███████████ in revenue from the MAVEN GIG service from November 2016 through August 2018; however, GM has yet to turn a profit. *See* Maven Gig Billing Collections; Bhattacharya Decl. ¶¶ 34–35; Adkisson Decl., Ex. 44 ("Distler Rpt.") ¶¶ 54, 70, 95. ████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████

### 3. Facts Leading to the Instant Litigation

AAA states that it first became aware of GM's MAVEN GIG mark on May 3, 2017 via GM's announcement. Haight Decl. ¶¶ 35–36. AAA sent GM a cease and desist letter on May 5, 2017 that asserted common law rights in the GIG mark. *Id.* ¶¶ 38–40; *see also* Adkisson Decl. ¶ 54, Ex. 53 ("5/5/17 Cease and Desist Letter"). The letter also stated "[i]n addition to common law rights in the 'GIG' service mark, AAA owns a pending application in the U.S. Patent and Trademark Office for the 'GIG' mark (Serial No. 87323670)." 5/5/17 Cease and Desist Letter. GM responded on May 16, 2017 and asserted that GM's use of the MAVEN GIG mark predated AAA's use of the GIG mark. Adkisson Decl. ¶ 16, Ex. 15 ("5/16/17 Email"). On May 11, 2017, GM filed a trademark application with the U.S. Patent and Trademark Office (U.S. Trademark Application Serial No. 87446290). Stooke Tr. at 59:4–25, 68:7–69:10; *see also id.*, Ex. 74.

United States District Court
Northern District of California

### B. Procedural History

AAA filed its lawsuit against GM on July 7, 2017. ECF No. 1 ("Compl."). AAA's complaint alleges causes of action for (1) Common Law Trademark Infringement; (2) Federal Unfair Competition and False Designation of Origin, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (3) Unfair Competition in violation of California Business and Professions Code § 17200, *et seq.*; and (4) Common Law Unfair Competition. *See* Compl. ¶¶ 42–67. After receiving an extension, GM filed its answer on August 25, 2017. ECF No. 20.

A week before GM had answered, GM filed a motion to stay the case pending resolution of the priority issue in the Trademark Trial and Appeal Board ("TTAB") on August 18, 2018. ECF No. 18. The Court denied GM's request to stay during the October 11, 2017 case management conference. *See* ECF No. 40.

On January 1, 2019, GM filed the instant motion for summary judgment. ECF No. 75 ("Mot."). On January 24, 2019, AAA opposed. ECF No. 77 ("Opp'n"). On January 31, 2019, GM replied. ECF No. 81 ("Reply").

## II. LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). If the nonmoving party fails to make this showing, "the moving party is entitled to

16

1  judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323.

2      At the summary judgment stage, the Court must view the evidence in the light most

3  favorable to the nonmoving party: if evidence produced by the moving party conflicts with

4  evidence produced by the nonmoving party, the judge must assume the truth of the evidence set

5  forth by the nonmoving party with respect to that fact. *See Leslie v. Grupo ICA*, 198 F.3d 1152,

6  1158 (9th Cir. 1999).

7      "Because of the intensely factual nature of trademark disputes, summary judgment is

8  generally disfavored in the trademark arena." *Interstellar Starship Servs., Ltd. v. Epix Inc.*, 184

9  F.3d 1107, 1109 (9th Cir. 1999) (citing *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1356

10  n. 5 (9th Cir. 1985)); *see also, e.g.*, *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand*

11  *Mgmt., Inc.*, 618 F.3d 1025, 1029, 1031 (9th Cir. 2010); *Entrepreneur Media, Inc. v. Smith*, 279

12  F.3d 1135, 1140 (9th Cir. 2002).

### III.  DISCUSSION

14      GM moves for summary judgment on all claims brought by AAA. GM asserts that all four

15  of AAA's claims rely on the same set of facts related to GM's use of the MAVEN GIG mark, and

16  therefore, all of AAA's claims are analyzed under the same standards as an infringement claim

17  under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Mot. at 12 & n.74. Plaintiff does not

18  dispute that the trademark ownership issue could dispose of all of its claims. *See* Opp'n; *see, e.g.*,

19  *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1202–03 (9th Cir. 2012) (explaining

20  that the state claims for common law trademark infringement and unfair competition claim, to the

21  extent they are based on infringement grounds, are subject to the same legal standards as the

22  Lanham Act trademark claim); *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 631 n.1, 632 (9th Cir.

23  2008) (noting that claims for false designation of origin under the Lanham Act, and unfair

24  competition "are subject to the same test."). Thus, the Court's decision on the trademark

25  ownership issue applies to all of AAA's claims.

26      Specifically, GM argues (1) that there is no genuine dispute as to any material fact

27  regarding GM's ownership of prior rights in the trademark MAVEN GIG over AAA's alleged

17

rights in the trademark GIG, and therefore GM is entitled to judgment as a matter of law. Mot. at i, 2. In the alternative, GM argues that (2) AAA cannot recover any monetary remedies in this action because there is no evidence, and thus no genuine dispute of material fact (a) that GM acted willfully or (b) that AAA suffered actual damages because of the alleged infringement. *See id.* The Court addresses each argument in turn, beginning with GM's priority argument.

**A. Summary Judgment is Not Warranted on Priority of Use**

To prevail on a Lanham Act trademark claim, AAA "must prove: (1) that it has a protectable ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion." *Rearden LLC.*, 683 F.3d at 1202–03 (internal quotation marks and citations omitted). An ownership interest in a mark is demonstrated through priority of use. *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir.1996) ("It is axiomatic in trademark law that the standard test of ownership is priority of use."). Therefore, AAA cannot prevail on its trademark claim if GM had prior use of the mark. *See Dep't of Parks & Rec. v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1124–25 (9th Cir. 2006). To establish priority of use, "it is not enough to have invented the mark first." *Sengoku Works Ltd.*, 96 F.3d at 1219. "[T]he party claiming ownership must have been the first to actually use the mark in the sale of goods or services." *Id.*; *see also Brookfield Commc'ns Inc. v. W. Coast. Entm't Corp.*, 174 F.3d 1036, 1051 (9th Cir. 1999) ("The Lanham Act grants trademark protection only to marks that are used to identify and to distinguish goods or services in commerce—which typically occurs when a mark is used in conjunction with the actual sale of goods or services.").

GM argues that it is entitled to summary judgment on the issue of priority because GM's use of the MAVEN GIG mark constitutes trademark use and predates any use by AAA of the GIG mark, and therefore AAA cannot establish that it owns valid trademark rights. Both parties agree that AAA first used its GIG mark on April 17, 2017. Accordingly, GM must establish that there is no genuine dispute that GM made use of the MAVEN GIG mark prior to April 17, 2017.

GM contends that there is no genuine dispute on priority of use for two reasons. First, GM argues that GM has made *actual* trademark use of the MAVEN GIG mark in commerce by selling

18

United States District Court
Northern District of California

and rendering its car share service under the MAVEN GIG mark. Mot. at 13. GM argues second that if its sales are not alone sufficient, then the totality of GM's non-sales activity under the MAVEN GIG mark constitutes *analogous* use. *See id.* The Court considers both of GM's arguments. For the reasons given below, the Court finds that GM is not entitled to summary judgment on priority of use under either argument.

### 1. GM is Not Entitled to Summary Judgment Based on Actual Use of the MAVEN GIG Mark in Connection with Sales Prior to April 17, 2017

GM first argues that there is no genuine dispute of material fact that GM actually used the MAVEN GIG mark in connection with its car share service sales prior to April 17, 2017. Mot. at 13–17. In particular, GM points to the fact that by April 17, 2017, GM had made sales of and rendered the MAVEN GIG service to approximately 284 customers and had collected approximately ███████ in revenue. *Id.* In opposition, AAA argues that GM's MAVEN GIG mark was not sufficiently used in conjunction with the actual sale of the car share service and therefore, the revenue and customer figures do not reflect actual use of the mark. Opp'n at 10–14.

Under the Lanham Act and Ninth Circuit law, "actual" trademark use occurs through "use in commerce," which means "the bona fide use of a mark in the ordinary course of trade, and not [use] merely to reserve a right in a mark." *Brookfield Commc'ns Inc.*, 174 F.3d at 1051 (quoting 15 U.S.C. § 1127). The Ninth Circuit has recognized that "evidence of actual sales, or lack thereof, is not dispositive in determining whether a party has established 'use in commerce' within the meaning of the Lanham Act. *Rearden*, 683 F.3d at 1205. However, for actual sales to be relevant, the mark must have been "used in conjunction with the actual sale of goods or services" in a public manner that "creates an association among consumers between the mark and the mark's owner." *Brookfield Commc'ns Inc.*, 174 F.3d at 1051; *see also* 15 U.S.C. § 1127 ("[A] mark shall be deemed to be used in commerce . . . on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce.").

As an initial matter, the "actual sales" cases relied on by GM, *Seal Shield, LLC v. Otter Prods., LLC*, and *Macy's Inc. v. Strategic Marks, LLC*, are distinguishable. For example, in *Seal*

United States District Court
Northern District of California

*Shield, LLC*, the court found prior use where plaintiff "sold 382 units of its protective Kindle 2 case with the designation 'Life Proof' *affixed* to the packaging." 13-cv-2736-CAB (NLS), 2014 WL 11350295, at *7 (S.D. Cal. Nov. 4, 2014) (emphasis added). Similarly, in *Macy's Inc.*, the court found use in commerce when there was "no real question that Macy's offers products displaying the disputed trademark for commercial sale on its website." 15-0612, 2016 WL 374147, at *6 (N.D. Cal. Feb. 1, 2016). In both of these cases, the sales could constitute actual use because the mark was attached to or displayed with a good that was, in turn, sold. Here, unlike in *Seal Shield, LLC* and *Macy's Inc.*, where the mark was simply affixed to the package or product itself, the mark at issue in the instant case is associated with a service, not a product, so the mark cannot directly be "affixed" to the service. There can, however, be use in connection with the sale of the service. *See Brookfield Commc'ns Inc.*, 174 F.3d at 1051 (explaining that for actual sales to be relevant, the mark must have been "used in conjunction with the actual sale of goods or services" in a public manner that "creates an association among consumers between the mark and the mark's owner.").

Perhaps recognizing that it cannot rely only on the sale in the same way as the parties in *Seal Shield, LLC* and *Macy's Inc.*, GM points to the following evidence from the car share service enrollment and reservation process during the Uber pilot program in an attempt to demonstrate that GM used the MAVEN GIG mark "publicly and repeatedly in connection with its *bona fide* sales between November 1, 2016, and April 17, 2017": (1) the statement next to the check box on the Enrollment Website that said "I agree to Maven Gig's Lease Agreement and Privacy Statement" before being able to proceed; (2) the reservation confirmation and reservation update emails that stated "Welcome to Maven Gig!" and instructed customers to let the parking attendant know "you are looking for Maven Gig" when picking up the rental car;[8] (3) other email correspondence with customers; and (4) the January 31, 2017 update to the Maven Website that allowed people to make reservations on the "Maven Gig" tab. Mot. at 16.

---

[8] GM also cites to evidence confirming that those emails were sent. Mot. at 16 n.80 (citing Adkisson Decl., Exs. 18 & 35).

Case No. 17-CV-03874-LHK
ORDER DENYING IN PART AND GRANTING IN PART MOTION FOR SUMMARY JUDGMENT

The Court addresses each in turn. The Court then addresses AAA's arguments regarding GM's use, including evidence that GM purposefully hid the MAVEN GIG mark. Ultimately, the Court concludes that despite GM's insistence that its sales numbers and revenue constitute evidence of priority, the MAVEN GIG mark was not sufficiently used in conjunction with the actual sale of the car share service in a public manner so as to create an association among consumers between the MAVEN GIG mark and the car share service.

### a. GM's Evidence in Support of GM's Actual Sales Argument is Insufficient

The Ninth Circuit has emphasized that parties cannot rely on a few instances of a use of a mark that were "'casual' or had 'little importance apparently attached to [them].'" *Dep't of Parks & Rec.*, 448 F.3d at 1126 (citation omitted). Similarly, this Court has previously recognized that "no goodwill is created when a mark is 'seen by the consuming public only in very limited quantity.'" *Sebastian Brown Prods. LLC v. Muzooka Inc.*, 15-CV-1720-LHK, 2016 WL 5910817, at *9 (N.D. Cal. Oct. 11, 2016) (quoting *E. & J. Gallo Winery v. Gallo Cattle Co.*, 1989 WL 159628, at *3 (E.D. Cal. Jun. 19, 1989), *aff'd E. & J. Gallo Winery*, 967 F.2d 1280 (9th Cir. 1992)).

In the paragraphs that follow, the Court addresses GM's evidence from the car share service enrollment and reservation process. Before doing so, however, the Court finds it useful to briefly discuss GM's pilot program with Uber because all of the evidence GM cites arises from this pilot program. GM and Uber entered into a three-month Pilot Agreement executed on October 31, 2016, that made Uber a rideshare partner. *See* Pilot Agreement; Steyn Tr. at 52:1–18, 97:8–19, 99:22–100:25; Stooke Tr. at 39:6–41:3; Bhattacharya Tr. at 53:2–15. That Pilot Agreement only mentioned Uber and Maven and did not mention MAVEN GIG. S*ee* Pilot Agreement. GM employees clarified that this was because GM technically never had a co-marketing agreement with Uber on MAVEN GIG. Bhattacharya Tr. at 255:4–18; Bowler Decl., Ex. 27.

The evidence shows that when GM developed MAVEN GIG, GM wanted MAVEN GIG to be a platform-agnostic, multi-partner product. However, when GM entered into its pilot program with Uber, Uber was GM's only partner. The evidence shows that GM recognized that

21

United States District Court
Northern District of California

having only one partner would be inconsistent with its platform-agnostic goals for MAVEN GIG. Bhattacharya Tr. at 150:13–151:4 (explaining that GM knew that if it "tried to message extensively about the platform agnostic aspects of [MAVEN GIG], the fact that [GM] only had one-co-marketing partner to begin with didn't look great with that."); Bowler Decl., Ex. 16 (11/1/2016 email from Rachel Bhattacharya, Director of Global Innovation at GM stating "Maven and Uber jointly answered questions to the press at 3 pm ahead of the formal release. Emails to the drivers go out today. It is simply being marketed as 'a pilot program with Maven and Uber;' we aren't using the GIG name publicly until later this year . . . when we have more partners on board."). Therefore, GM did not have a marketing campaign or intend to market MAVEN GIG until it had partners other than Uber. Bhattacharya Tr. at 59:4–60:8, 156:1–158:18, 214:8–11; *see also* Bowler Decl., Ex. 16. Thus, the MAVEN GIG mark is not mentioned in the media talking points or the official communications plan regarding GM's pilot program with Uber. Steyn Tr. at 110:21–112:24; Media Briefing Talking Points; Bhattacharya Tr. at 152:12–155:25; Communications Plan. Instead, as discussed below, GM only used MAVEN GIG in limited and casual instances with the Uber drivers in the pilot program.

### i. The Enrollment Process

GM's evidence from the car share service enrollment and reservation process resembles the casual or limited use about which courts have cautioned, especially when compared to the prominent use of the Maven mark in the customer facing communications. For example, GM continuously emphasizes the fact that the Uber drivers who received the sign-up email during the pilot program and went to the Enrollment Website that included the Maven mark but did not include the MAVEN GIG mark, had to check a box next to the statement, "I agree to *Maven Gig*'s Lease Agreement and Privacy Statement" before being able to proceed. *See* First Enrollment Screen (emphasis added); Jaising Decl. ¶ 7; *see also* Reply at 6–7. This is the only use of "MAVEN GIG" prior to completing enrollment in the pilot program. The Court finds it useful to discuss the enrollment process, including this check box statement, before discussing the insufficiency of this use of the mark.

As part of the Pilot Agreement, Uber contacted drivers through a sign-up email to promote the car share service and to explain how to rent a car. Bhattacharya Decl. ¶ 19; Jaising Decl. ¶ 6. The Uber sign-up email mentioned Uber and Maven but did not mention MAVEN GIG. *See* Uber Driver Email; Bhattacharya Tr. at 113:18–114:22; Stooke Tr. 84:19–85:3. Specifically, the sign-up email stated: "We've teamed up with Maven." *See* Uber Driver Email. The Uber sign-up email contained a hyperlink that led to the landing page at www.mavendrive.com/gig, and the Enrollment Website at www.mavendrive.com/gig/#!enroll, which directed customers to complete a four-part enrollment form to create an account, provide personal and credit card information, and schedule an appointment to rent a car. Bhattacharya Decl. ¶¶ 19–20; Jaising Decl. ¶ 6; Adkison Decl., Ex. 13. Anyone with the hyperlink could access the site; however, the link was only emailed to existing Uber drivers through the Uber sign-up email and was not sent to the general public. Steyn Tr. at 95:1–96:20; Bowler Decl., Ex. 19; Bhattacharya Tr. at 26:11–27:15.

The first screen of the Enrollment Website bore the "Maven" mark in large text in the top left corner, but not the "MAVEN GIG" mark. *See* First Enrollment Screen. The description on the website stated "Welcome to Maven! . . . Once you have completed the registration process, it can take up to 2 business days to be approved." *Id.* As shown in Section I.A.2.e. of this Order, the MAVEN GIG mark appeared only once, at the bottom of the first screen of the Enrollment Website, where customers were required to check a box next to the statement, "I agree to Maven Gig's Lease Agreement and Privacy Statement." *Id.*; Jaising Decl. ¶ 7; *see also* First Enrollment Screen. The MAVEN GIG check box statement appeared in font far smaller than the Maven mark. *See* First Enrollment Screen. Customers were not permitted to move onto the next screen of the Enrollment Website if they did not check the box acknowledging this statement. *See id.*; Jaising Decl. ¶ 7. Although the statement next to the check box mentioned MAVEN GIG, the lease agreement itself did not display the MAVEN GIG mark and only mentioned Maven. *See* Maven Program Rental Agreement; Bhattacharya Tr. at 146:1–147:24; Gig Enrollment Flow at 3.

All Uber drivers who checked the box received a welcome email prompting verification by clicking on a URL (www.mavendrive.com/gig/#!/emailConfirm/). Jaising Decl. ¶ 8. The welcome

United States District Court
Northern District of California

email did not mention MAVEN GIG and instead bore only the Maven mark. Gig Enrollment Flow at 7. Drivers were then prompted to complete the next three screens of the Enrollment Website, which required them to enter payment details and driver's license information, and to select a car rental appointment time. Jaising Decl. ¶ 8; 5th Resp. to AAA's 1st Interrogs. at 18–19; Bhattacharya Tr. at 81:16–83:16. The MAVEN GIG mark was not present on any of these screens, and instead the screens showed only the Maven mark. *See* Gig Enrollment Flow at 4–6.

Having reviewed GM's use of the MAVEN GIG mark in this context, the Court finds that the limited mention of MAVEN GIG at the end of the first screen of the Enrollment Website does not constitute sufficient use "in conjunction with" the actual sale of the service. *See Brookfield Commc'ns Inc.*, 174 F.3d at 1051. For instance, in *Farmasino, Inc. v. Farmasino Pharms. Co.*, the court found that defendant had used the mark when the defendant created a website that "prominently displayed the Name and the Mark." 5:15-cv-01977-SVW-DTB, 2016 WL 7655740 (C.D. Cal. Jun. 20, 2016). By contrast here, because the only display of the MAVEN GIG mark on the entire Enrollment Website is at the bottom next to the check box, it likely was not meant to attract the attention of the viewer to the mark. *See Dep't of Parks & Rec.*, 448 F.3d at 1127 ("Because neither of the brochures was designed to attract the attention of the viewer to the marks themselves, they fail to create any association between the marks and the tourism and recreation services provided by the Department of Parks."). Nor would the statement next to the check box make it immediately obvious to customers that MAVEN GIG was being used to describe the service. *See also* 1 McCarthy on Trademarks and Unfair Competition § 3:4 (5th ed.) ("In the ordinary course of shopping, either in brick & mortar stores or on the internet, most customers do not spend time closely examining labels and advertising copy. Usually, if when viewed in context, it is not immediately obvious that a certain word or design is being used as an indication of origin, then it probably is not. In that case, it is not a trademark. If a designation is being used as a trademark, it should be obvious at first glance.").

The limited and casual nature of the one mention of the MAVEN GIG mark during the pilot program enrollment process is underscored by the prominent use of the Maven mark during

this process in the sign-up emails and on the Enrollment Website, including in the sign-up email that only mentioned Maven but not MAVEN GIG; the First Enrollment Screen on the Enrollment Website that bore the large "Maven" mark in the top left corner and that stated "Welcome to Maven!"; the welcome email that bore only the Maven mark; and the second, third, and fourth screens of the Enrollment Website, where driver's entered payment details, driver's license information, and selected a car rental appointment time, which bore only the Maven mark. *See* Gig Enrollment Flow. The prominent use of the Maven mark instead of the MAVEN GIG mark during the enrollment process may diminish "the public's ability to associate a single mark" with the service "as it is unclear which mark to attach to the [service]." *Nexsan Techs., Inc. v. EMC Corp.*, 260 F. Supp. 3d 68, 77 (D. Mass. 2017) (finding no priority when "use of the mark [was] insufficiently clear or repetitive" such that the "public's ability to associate a single mark with the tested goods" was diminished); *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 334, 342 (4th Cir. 2011) (finding that use of mark did not constitute trademark use when "[u]nlike certain MicroStrategy trademarks, e.g., 'Intelligent E–Business,' MicroStrategy [did] not consistently place[ ] 'Intelligence Everywhere' on a particular part of the page, or in a particular type, or label[ ] it with 'TM,' or consistently use[ ] a distinctive font, color, typeset or any other method that makes 'its nature and function readily apparent and recognizable without extended analysis'"). Therefore, the Court is not persuaded that the small statement next to the check box constitutes sufficient "use."

Further, it bears mentioning that the Lease Agreement and Privacy Statement to which the drivers were asked to agree did not mention the MAVEN GIG mark either. *See* Maven Program Rental Agreement. Instead, the Lease Agreement and Privacy Statement only referred to the "Maven Program" and the "Uber Program." Therefore, unlike in *Telegram Messenger Inc. v. Lantah, LLC*, where the court granted summary judgment for the plaintiff on priority of use because plaintiff had entered into $850 million worth of purchase agreements that actually bore the mark at issue, Uber drivers in the pilot program entered into a Lease Agreement that did not mention the MAVEN GIG mark at all. *See* 18-cv-2811-CRB, 2018 WL 3753748, at *4–6 (Aug. 8,

Case No. 17-CV-03874-LHK
ORDER DENYING IN PART AND GRANTING IN PART MOTION FOR SUMMARY JUDGMENT

2018) (appeal filed).

Besides the statement next to the check box, the only thing that comes close to mentioning the MAVEN GIG mark during the enrollment process were the hyperlinks in the emails to the Uber drivers, including www.mavendrive.com/gig/#!enroll and www.mavendrive.com/gig/#!/emailConfirm/. *See* Jaising Decl. ¶¶ 6, 8. However, these hyperlinks are to the website www.mavendrive.com and do not use the MAVEN GIG mark. Moreover, the Ninth Circuit has held that using a hyperlink or a domain name in e-mail communications is not sufficient to establish priority. *See Brookfield*, 174 F.3d at 1052 (explaining that use of "moviebuff.com" in e-mail correspondence with lawyers and customers is "akin to putting one's mark 'on a business office door sign, letterheads, architectural drawings, etc.' or on a prototype displayed to a potential buyer, both of which have been held to be insufficient to establish trademark rights." (citations omitted)). Thus, the Court finds that the MAVEN GIG mark was not sufficiently "used" during the enrollment process.

### ii. GM's Communications with Customers

#### a. Reservation Confirmation and Reservation Update Email

GM also points to evidence of post-enrollment use of the mark, meaning evidence of use of the mark *after* customers had already signed-up. For example, GM cites the reservation confirmation and reservation update emails as well as evidence confirming that those emails were sent. *See* Mot. at 16. Specifically, the reservation confirmation and reservation update emails displayed a large Maven mark header in the body of the email. *See, e.g.*, Confirmation Emails at GM559393–45; *see also* Section I.A.2.e. By contrast, the email's text stated, "Welcome to Maven Gig!" and provided instructions to let the parking attendant know "that you are looking for Maven Gig" in font smaller than the large Maven mark header. Jaising Decl. ¶ 9; *see also* Confirmation Emails at GM559393–45; Adkisson Decl., Exs. 16, 17, 18, & 35. The confirmation email was signed "The Maven Team." *See* Confirmation Emails at GM559393–45.

As an initial matter, the parties dispute the relevancy of these emails to the "sale" because these emails occurred after the enrollment process. In particular, AAA points out that these emails

were an auto-generated reservation confirmation email sent after drivers decided to enroll in the Uber pilot program and had already entered their payment and driver's license information online. *See* Opp'n at 16.

Regardless, even if the Court considers the reservation confirmation and reservation update emails, like the statement next to the check box, this evidence does not constitute sufficient use of the MAVEN GIG mark. First, the uses of the MAVEN GIG mark in these emails appear to be "casual," *Dep't of Parks & Rec. v*, 448 F.3d at 1126, or "limited," *Sebastian Brown Prods. LLC*, 2016 WL 5910817, at *9. For instance, the reservation confirmation and reservation update emails displayed the "Maven" mark in large font in the header. *See, e.g.*, Confirmation Emails at GM559393–45. As the email image in Section I.A.2.e. of this Order shows, although, the email's text stated, "Welcome to Maven Gig!" and provided instructions to let the parking attendant know "that you are looking for Maven Gig," this text was in font far smaller than the large Maven mark header. *See id.* Further, the email was signed "The Maven Team." *Id.* Thus, the limited email use of the MAVEN GIG mark is less compelling when coupled with the prominent use of the large Maven mark header and the signature of "The Maven Team." *See, e.g.*, *Seal Shield, LLC*, 2014 WL 11350292, at *4 ("For instance, even if a visitor to KlearKase's Amazon.com page scrolled to the Product Description section and saw the paragraph heading 'Life Proof,' that consumer would have no more reason to associate KlearKase's product with the term 'Life Proof' than with other paragraph headings, like 'Splash Proof.'"); *id.* ("[T]he same consumer would not directly associate the KlearKase for Kindle 2 with the term 'Life Proof' after seeing the term once in an eight-paragraph, 510–word press release or in a lone tweet."); *Vitality Anti-Aging Center and Med Spa, LLC v. La Bella Donna Advanced Laser Med-Spas of North America, LLC*, 5:08cv108, 2009 WL 348217, at *6 (W.D.N.C. Feb. 11, 2009) (finding that a mark did not serve the service mark function of identifying the source of the services advertised because "[a]lthough the Mark was present on the fliers, it was printed in small font, given little prominence compared to the other text, and accompanied by several other slogans").

Moreover, case law suggests that this minimal, two-time mention of MAVEN GIG in

email communications would not create in the minds of a customer any direct association between the underlying service and the MAVEN GIG mark. Indeed, the Ninth Circuit has already found that "mere use [of a mark] in limited e-mail correspondence with . . . a few customers is not" sufficient to create an association among the public between the mark and the good or service. *See Brookfield Commc'ns Inc.*, 174 F.3d at 1052. For example, in *Brookfield*, the Ninth Circuit distinguished the "limited e-mail correspondence with lawyers and a few customers," which did not constitute use sufficient to create an association, from what it identified as sufficient activity, including an "announcement to 13 million comic book readers" in one case, and "the mailing of 430,000 solicitation letters with one's mark to potential subscribers of a magazine" in another. *Brookfield*, 174 F.3d at 1052 (citing *Marvel Comics, Ltd. v. Defiant*, 837 F. Supp. 546, 550 (S.D.N.Y. 1993), and *New West Corp.*, 595 F.2d at 1200); *see also, e.g., Sebastian Brown Prods. LLC*, 2016 WL 5910817, at *9 ("[d]isplaying a 'prototype' and exchanging 'limited e-mail correspondence,' is essentially the activity that Miller's emails evince. This does not constitute use of a mark that is 'sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark.'" (citations omitted)).

Finally, the emails themselves are private one-on-one communications with individuals, not public use of the mark. As such, the reservation confirmation and reservation update emails do not support a finding of use. *See Brookfield Commc'ns Inc.*, 174 F.3d at 1051 ("The purpose of a trademark is to help consumers identify the source, but a mark cannot serve a source-identifying function if the public has never seen the mark."); *Matrix Motor Co. v. Toyota Motor Sales, U.S.A., Inc.*, 120 F. App'x 30, 31 (9th Cir. 2005) (finding no prior use where mark was not "visible to the public" because it was used on interior car parts).

### b. Customer Email Inquiries

Similarly, the sample communications between GM and customers, including a few email inquiries from customers and the PDF presentation that GM sent to a few customers, are insufficient to support a finding that the MAVEN GIG mark was "used" in connection with the sales. *See, e.g.*, Adkisson Decl., Ex. 21 (email dated 2/22/2017); *id.*, Ex. 22 (emails dated

28

1/5/2017–1/6/2017); *id.*, Ex. 23 (email dated 2/8/2017); *id.,* Ex. 24 (email dated 3/15/2017); *id.*, Exs. 25–28; *id.*, Ex. 29 (email dated 3/2/2017 attaching PDF). Specifically, these sample communications between GM and customers consisted of email inquiries and responses between GM and customers regarding the car share service. In these emails, GM answered questions from customers and: (1) confirmed that customers were interested in GM's "Maven Gig program" (as opposed to GM's other services under Maven); (2) advised customers that their inquiry would be forwarded to GM's "Maven Gig" team; and (3) provided information to customers about the MAVEN GIG service. *See, e.g.*, Adkisson Decl., Ex. 21 (email dated 2/22/2017); *id.*, Ex. 22 (emails dated 1/5/2017–1/6/2017); *id.*, Ex. 23 (email dated 2/8/2017); *id.,* Ex. 24 (email dated 3/15/2017).

However, GM's use of the MAVEN GIG mark in the sample communication emails appeared limited and inconsistent, as well as potentially overshadowed by GM's more prominent use of the Maven mark. For instance, although some of GM's emails discussed the MAVEN GIG service, GM sent the emails from a Maven email address, such as memberservices@maven.com; GM signed the emails "Maven Member Services"; and GM's emails displayed a prominent Maven mark. *See, e.g.*, Adkisson Decl., Exs. 21 & 23. In addition, the PDF presentation that GM sent out mentions the Maven Website, the "Maven Lease Agreement," Maven insurance, the "Maven vehicle," and the "Maven bill." *Id.*, Ex. 21. Further, several of GM's emails referred to the service inconsistently, including "[o]ur program with Uber," "[o]ur Uber program," "[o]ur partnership with Uber." *See, e.g.*, *id.*; *id.*, Ex. 29. As discussed above, GM's use of different names may diminish "the public's ability to associate a single mark" with the service "as it is unclear which mark to attach to the [service]." *Nexsan Techs., Inc.*, 260 F. Supp. 3d at 77; *MicroStrategy Inc.*, 245 F.3d at 342 (finding that use of mark did not constitute trademark use when "[u]nlike certain MicroStrategy trademarks, e.g., 'Intelligent E–Business,' MicroStrategy [did] not consistently place[ ] 'Intelligence Everywhere' on a particular part of the page, or in a particular type, or label[ ] it with 'TM,' or consistently use[ ] a distinctive font, color, typeset or any other method that makes 'its nature and function readily apparent and recognizable without extended analysis'"); *see*

*also Vitality Anti-Aging Center and Med Spa, LLC*, 2009 WL 348217, at *6 (finding that a mark did not serve the service mark function of identifying the source of the services advertised because "[a]lthough the Mark was present on the fliers, it was printed in small font, given little prominence compared to the other text, and accompanied by several other slogans").

As a result of GM's limited and casual uses, GM's argument that its use of the MAVEN GIG mark created an association in the minds of customers is dubious. GM points to several of the sample communication emails between GM and customers to say that there is evidence in the record that customers themselves actually referred to the MAVEN GIG service in their email inquiries beginning in January 9, 2017, and therefore customers associated MAVEN GIG with GM's car share service. S*ee* Reply at 7–8 (citing Adkisson Decl., Exs. 27 & 28); *see also* Adkisson Decl., Exs. 21, 25, & 26. However, the sufficiency of these few sample communication emails between GM and customers is called into question when compared to other sample communications demonstrating that customers had no idea what the service was called. *See, e.g.*, Adkisson Decl., Ex. 22 (customer referring only to "Maven" in 1/5/17 email); *id.*, Ex. 23 (customer referring only to "Maven" and "Uber" in 2/8/17 email); *id.*, Ex. 24 (customer referring only to "Maven Team" in 3/14/17 email); *id.*, Ex. 29 (customer referring to "Uber driver program" in 3/1/17 email); Bowler Decl., Exs. 31 & 35 (customer referring to "Uber/Maven Program" in 11/30/16 and 12/11/16 emails); *id.*, Ex. 36 (customer using no mark to describe application in 12/1/16 email). Thus, these sample communications between GM and customers provide evidence that GM's use of different names may have diminished the customer's ability to associate a single mark with the MAVEN GIG service as the evidence shows that it is was unclear to customers "which mark to attach to the [service]." *Nexsan Techs., Inc.*, 260 F. Supp. 3d at 77 (finding no priority when "use of the mark [was] insufficiently clear or repetitive" such that the "public's ability to associate a single mark with the tested goods" was diminished).

Next, like the reservation confirmation and update emails, the subset of the sample communications between GM and customers that are post-enrollment communications between

GM and customers[9] raise questions about whether these communications are relevant to determining that the MAVEN GIG mark was "used" in connection with the sales because these emails arrived *after* drivers had already enrolled for the car share service.

Finally, as already emphasized above, the sample communications between GM and customers are insufficient to establish use because the Ninth Circuit has already explained that the mere use of a mark in limited e-mail correspondence with a few customers is not sufficient to create an association between the mark and the service. *See Brookfield Commc'ns Inc.*, 174 F.3d at 1052. Here, GM's emails with customers regarding the car share service similarly fails because these communications were private, one-on-one email communications in which GM clarifies or assists a driver with the car share service. *See also T.A.B. Sys. v. Pactel Teletrac*, 77 F.3d 1372, 1376 (Fed. Cir. 1996) ("Likewise with PacTel's slide show presentations to seven potential customers: we discern nothing in the record to indicate whether this group of customers constituted more than a negligible portion of the relevant market."); *Sebastian Brown Prods. LLC*, 2016 WL 5910817, at *9 ("[d]isplaying a 'prototype' and exchanging 'limited e-mail correspondence,' . . . does not . . . 'distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark.'" (citations omitted)).

### iii. The MAVEN GIG Tab on Maven Website

Finally, the last evidence cited by GM is evidence that beginning around January 31, 2017, existing drivers could make new reservations to rent cars through the MAVEN GIG service on the Maven Website by clicking to expand a section of the website that was specifically titled "Maven Gig." Jaising Decl. ¶ 17; Adkisson Decl., Ex. 21 at GM56459. AAA challenges this evidence because the tab was only accessible to existing users with a Maven account. Opp'n at 19. That is, the "webpage could only be reached after a user logs on to the Maven Drive website and enters their [Maven] login information. Customers without a [Maven] or an Uber pilot account would

---

[9] *See, e.g.*, Adkisson Decl., Ex. 21 (email inquiring as to the total cost when picking up car); *id.*, Ex. 25 (email inquiring how to return rented vehicle); *id.*, Ex. 26 (email inquiring how to swap cars); *id.*, Ex. 27 (email requesting to cancel Maven account).

Case No. 17-CV-03874-LHK
ORDER DENYING IN PART AND GRANTING IN PART MOTION FOR SUMMARY JUDGMENT

never have encountered MAVEN GIG." *Id.*; *see* Jaising Decl. ¶ 17 (showing screenshot of access to the Maven Gig tab only after logging into Maven account). The Court agrees with AAA that the fact that only an existing Maven account user could see this tab raises questions about the private use of the mark on the webpage and how many drivers actually came in contact with this use of the mark. *See Brookfield Commc'ns Inc.*, 174 F.3d at 1051 ("The purpose of a trademark is to help consumers identify the source, but a mark cannot serve a source-identifying function if the public has never seen the mark."). More importantly, GM's use of the MAVEN GIG mark in this manner is overshadowed by the prominent use of the Maven mark on the Maven Website and during the entire enrollment process. The prominent use of the Maven mark instead of the MAVEN GIG mark diminishes the public's ability to associate MAVEN GIG with the car share service "as it is unclear which mark to attach to the [service]." *See Nexsan Techs., Inc.*, 260 F. Supp. 3d at 77.

### b. Evidence that GM was Hiding MAVEN GIG Mark

The Court also agrees with AAA that evidence shows that GM purposefully hid the MAVEN GIG mark during the Uber pilot program. This undermines GM's claim that the MAVEN GIG mark was sufficiently used in conjunction with the actual sale of the car share service in a public manner to create an association among customers between the MAVEN GIG mark and GM's car share service, and whether GM's actual sales are, in turn, relevant.

For instance, before GM entered into its pilot program with Uber, GM had a program with Lyft called "EXPRESS DRIVE" for the use of GM vehicles in providing Lyft services. Bhattacharya Tr. at 33:19–34:8; Steyn Tr. at 20:11–25:9. Before the fall of 2016, however, GM's relationship with Lyft and EXPRESS DRIVE became strained due to unprofitability and unaligned incentives. Bhattacharya Tr. at 50:10–51:6; Steyn Tr. at 24:16–25:10; 53:18–23. In particular, GM wanted direct contact with the drivers. Steyn Tr. at 53:18–23. Therefore, in the summer of 2016, GM began exploring an alternative "platform-agnostic" model where GM would maintain a direct relationship with drivers regardless of the business partnership. *Id.*; Stooke Tr. at 37:13–38:22.

The record demonstrates that because GM had not given Lyft formal notice that GM was

exiting its EXPRESS DRIVE program with Lyft, and because Lyft and Uber were competitors, GM was still sensitive about its Lyft partnership when GM began its relationship with Uber. Therefore, GM wanted to get "Express Drive unwound" before they got "[MAVEN GIG] up and running." Steyn Tr. at 55:21–57:25, 89:20–90:20; Bhattacharya Tr. at 148:13–151:4 ("[W]e knew the entire conversation would be about Uber and Lyft, in any case, and that the message we wanted to tell would get lost."); *see also* Bowler Decl., Ex. 15. Moreover, GM wanted MAVEN GIG to be a platform-agnostic, multi-partner product, and knew that if GM "tried to message extensively about the platform agnostic aspects of [MAVEN GIG], the fact that [GM] only had one-co-marketing partner to begin with didn't look great with that." Bhattacharya Tr. at 150:13–151:4. Therefore, GM did not have a marketing campaign or intend to market MAVEN GIG until it had other partners besides Uber. *Id.* at 59:4–60:8, 156:1–158:18, 214:8–11; *see also* Bowler Decl., Ex. 16. Thus, the MAVEN GIG mark is not mentioned in the media talking points or the official communications plan regarding GM's pilot program with Uber. Steyn Tr. at 110:21–112:24; Media Briefing Talking Points; Bhattacharya Tr. at 152:12–155:25; Communications Plan.

Moreover, evidence in the record suggests that GM issued a press release on May 3, 2017 because the MAVEN GIG service was not technically public yet at that time. *See* 5/3/2017 MAVEN GIG Press Release; Bhattacharya Tr. at 190:7–14, 192:23–193:9; Bowler Decl., Ex. 24 ("Note that Gig isn't technically public yet"); *id.*, Ex. 25 (4/17/2017 Email stating "we aren't announcing the Gig business until 2 weeks from now."); *id.*, Ex. 26 (2/25/2017 emails stating "I just wanted to make sure we were on the same page in respect to communications. The direction is to NOT make a lot of noise around the Australian Maven Gig partnership with Uber in March. So please, do not issue any press releases" and that "we are 100% aligned on not doing anything external during our pilot."). However, GM disputes this evidence and asserts that the May 3, 2017 was merely an "expansion" of the MAVEN GIG service. *See* Mot. at 8–9.

The Court concludes that evidence that GM sought to play down the MAVEN GIG mark during its pilot program with Uber supports the inference that the uses of the MAVEN GIG mark

were purposefully limited and casual so as to not create an association among consumers between the mark and the service, such that the revenue[10] and customer figures do not reflect actual use of the mark. *See, e.g.*, *Sebastian Brown Prods. LLC*, 2016 WL 5910817, at *8 (discussing the non-public nature of the use where plaintiff attempted to keep mark confidential and asked someone in an email to keep the idea "under [her] hat").

Accordingly, having reviewed GM's evidence regarding its use, the Court concludes that GM is not entitled to summary judgment on priority of use on the basis of its actual use of the MAVEN GIG mark.

### 2. GM is Not Entitled to Summary Judgment Based on Analogous Use of the MAVEN GIG Mark

The Court turns next to GM's second argument regarding priority. Specifically, GM argues that GM's use of the MAVEN GIG mark through pre-sales activity are sufficient to establish "analogous use" to trademark use prior to April 17, 2017. Mot. at 17–20. The Court disagrees.

The Ninth Circuit has held that "trademark rights can vest even before any goods or services are actually sold if 'the totality of [one's] prior actions, taken together, [can] establish a right to use the trademark." *Brookfield Commc'ns Inc.*, 174 F.3d at 1052 (quoting *New West Corp. v. NYM Co. of Cal.*, 595 F.2d 1194, 1200 (9th Cir. 1979)). Non-sales activity establishes use analogous to trademark use when a party uses a mark "in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind." *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1158 (9th Cir. 2001) (quoting *New West Corp.*, 595 F.2d at 1200). The "appropriate segment of the public mind" is the "segment of the purchasing public for whom the services are intended." *Pactel Teletrac*, 77 F.3d at 1376. Further, the use is sufficient so long as "more than a negligible portion of the relevant market" associates the mark with the service. *Id.*

---

[10] The Court notes that even in the briefing on the instant motion, GM itself conflates its Maven business and MAVEN GIG business. ███████████████████████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████

Case No. 17-CV-03874-LHK
ORDER DENYING IN PART AND GRANTING IN PART MOTION FOR SUMMARY JUDGMENT

at 1376–77. In making this determination, courts examine the "totality of the circumstances" by examining factors, such as "the genuineness and commercial character of the activity"; "the scope of the non-sales activity relative to what would be a commercially reasonable attempt to market the service"; "the degree of ongoing activity of the holder to conduct the business using the mark"; and "the amount of business transacted." *Chance,* 242 F.3d at 1159.

The Court finds that GM's analogous use arguments fail. First, GM relies on much of the same evidence and arguments that GM relied on for its actual use argument, like the statement next to the check box on the Maven Website and the emails with customers. *See* Mot. at 18–19. These arguments fail for the same reasons discussed in Section III.A.1. For example, the check box statement was not "designed to attract the attention of the viewer to" the MAVEN GIG mark itself, and therefore it fails to create any association between the mark[ ] and the . . . service[ ]." *Dep't of Parks & Rec.*, 448 F.3d at 1127. Further, exchanging "limited e-mail correspondence," *Brookfield*, 174 F.3d at 1052, does not constitute use of a mark that is "sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark." *Dep't of Parks & Rec. v*, 448 F.3d at 1126. For example, in *Brookfield*, the Ninth Circuit distinguished the "limited e-mail correspondence with lawyers and a few customers," which did not constitute use sufficient to create an association, from what it identified as sufficient activity, including an "announcement to 13 million comic book readers" in one case, and "the mailing of 430,000 solicitation letters with one's mark to potential subscribers of a magazine" in another. *Brookfield*, 174 F.3d at 1052 (citing *Marvel Comics, Ltd.*, 837 F. Supp. at 550, and *New West Corp.*, 595 F.2d at 1200); *see also Pactel Teletrac*, 77 F.3d at 1376 ("Likewise with PacTel's slide show presentations to seven potential customers: we discern nothing in the record to indicate whether this group of customers constituted more than a negligible portion of the relevant market.").[11]

---

[11] GM also argues that 800 customers reserved a car through the Maven Website and received a confirmation email. Reply at 12. However, this figure is not supported by GM's citations to the record. *See* Jaising Decl. ¶ 23; *see also* Customer Data. Moreover, GM's use of the Maven mark diminished the public's ability to associate GM's car share service with the MAVEN GIG mark.

In addition, the Court found GM's use of the MAVEN GIG mark in GM's email communications with customers limited and inconsistent, as well as potentially overshadowed by more prominent use of the Maven mark. For example, the reservation confirmation email bore a large Maven mark header, while the email's text stated, "Welcome to Maven Gig!" in font smaller than the large Maven mark header. Confirmation Emails at GM559393–45. The email exchanges with customers similarly displayed limited uses of the MAVEN GIG mark as compared to the Maven mark. For instance, GM sent the emails from a Maven email address, such as memberservices@maven.com; GM signed the emails "Maven Member Services"; and GM's emails displayed a prominent Maven mark. *See, e.g.*, Adkisson Decl., Exs. 21 & 23. In addition, the PDF presentation that GM sent out mentions the Maven Website, the "Maven Lease Agreement," Maven insurance, the "Maven vehicle," and the "Maven bill." *Id.*, Ex. 21. Further, several of GM's emails referred to the service inconsistently, including "[o]ur program with Uber," "[o]ur Uber program," "[o]ur partnership with Uber." *See, e.g., id.*; *id.*, Ex. 29. As discussed above, the Court found that GM's use of different names may diminish "the public's ability to associate a single mark" with the service "as it is unclear which mark to attach to the [service]." *Nexsan Techs., Inc.*, 260 F. Supp. 3d at 77.

Second, GM points to its communications with potential partners like Instacart, Grubhub, and Roadie as activities constituting analogous use. Mot. at 18–19. However, these businesses are not the "appropriate segment of the public." *Pactel Teletrac*, 77 F.3d at 1376. As even GM agrees in its opening brief, the "appropriate segment of the public mind" is the "segment of the purchasing public for whom the services are intended." *See* Mot. at 17 (citing *Pactel Teletrac*, 77 F.3d at 1376). The Court agrees with AAA that the appropriate segment of the public is members of the public who are likely to drive for a car share service. Opp'n at 20. Potential partners of the service are not the appropriate segment of the public.

Moreover, GM's communications with potential partners like Instacart, Grubhub, and Roadie merely show that GM was trying to find more partners with whom to work to ultimately target the appropriate segment of the public. This looks more like "mere preparation" to use the

Case No. 17-CV-03874-LHK
ORDER DENYING IN PART AND GRANTING IN PART MOTION FOR SUMMARY JUDGMENT

MAVEN GIG mark in commerce, which is not sufficient. *See Sebastian Brown Prods. LLC*, 2016 WL 5910817, at *9. For instance, in *Sebastian Brown Prods. LLC*, this Court found insufficient the fact that the party had "reached out and discussed his 'business project,' 'proposal,' and 'idea' to individuals in various marketing and creative industries." 2016 WL 5910817, at *8. This Court, citing Ninth Circuit law, explained that putting a mark on a "prototype displayed to a potential buyer," among other things, was not sufficient. *Id.* at *9 (citing *Brookfield*, 174 F.3d at 1052). Moreover, these private discussions with potential partners are not "sufficiently public." *Id.* at *9.

Further, even if the Court were to consider the communications with the potential partners as evidence that GM was targeting the "appropriate segment of the public mind," the limited nature of these communications with potential partners would still be insufficient for the public to associate the mark with the service. *See id.* ("[N]o goodwill is created when a mark is 'seen by the consuming public only in very limited quantity.'" (citing *E. & J. Gallo Winery*, 1989 WL 159628, at *3)); *Pactel Teletrac*, 77 F.3d at 1376 ("Likewise with PacTel's slide show presentations to seven potential customers: we discern nothing in the record to indicate whether this group of customers constituted more than a negligible portion of the relevant market."). Further, the marketing to potential partners demonstrates that the MAVEN GIG mark was used by GM in a limited and casual manner in the emails and slides and only in private communications.

Third, GM cites post-April 17, 2017 evidence to show that GM's "use of the mark[ ] was continuous and not interrupted." *Dep't of Parks & Rec.*, 448 F.3d at 1126; Reply at 12. Specifically, GM cites evidence that GM added new business partners, expanded marketing and paid advertising activities, received substantial news coverage after GM issued its May 3, 2017 press release, and earned revenue through August 2018. Mot. at 20. Nonetheless, the Court is not persuaded that GM's use of the MAVEN GIG mark *after* May 3, 2017, directs this Court to conclude that under the "totality of the circumstances," GM had priority *prior* to April 17, 2017. This is because, as already discussed, GM had continuously downplayed the use of the MAVEN GIG mark before GM had achieved its goals of obtaining additional partners and becoming platform agnostic.

37

In sum, the Court finds that the totality of GM's evidence does not establish that GM's pre-sale activities rose to the level of "sufficiently public" use of the MAVEN GIG mark so as to "identify or distinguish the marked goods in an appropriate segment of the public mind." *Chance,* 242 F.3d at 1158. Therefore, having rejected both GM's actual sales and analogous sales arguments, the Court DENIES GM's motion for summary judgment on priority of use.

**B. Summary Judgment is Warranted on Monetary Remedies**

GM argues in the alternative that GM is entitled to summary judgment on the issue of monetary remedies because (1) there is no evidence that GM acted willfully; and (2) there is no evidence that AAA has experienced any actual damages as a result of GM's use of the MAVEN GIG mark. Mot. at 20–25. After addressing each argument below, the Court GRANTS GM's motion for summary judgment on willfulness and on actual damages.

**1. There is No Evidence of Willfulness**

GM first argues that there is no evidence of willfulness, and thus that AAA cannot disgorge GM's profits. Mot. at 20–22. The Court agrees.

"Under the remedies provision of the Lanham Act, a court may award" the "defendant's profits." *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 439 (9th Cir. 2017) (citing 15 U.S.C. § 1117(a)). In the Ninth Circuit, a plaintiff seeking disgorgement of a defendant's profits in a trademark infringement case must demonstrate that the defendant willfully infringed the plaintiff's trademark. *See id.* "Willful infringement carries a connotation of deliberate intent to deceive." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1405 (9th Cir. 1993), *abrogated on other grounds by SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th Cir. 2016). "Courts generally apply forceful labels such as 'deliberate,' 'false,' 'misleading,' or 'fraudulent' to conduct that meets this standard." *Id.* In particular, disgorgement is permitted only in those cases where the infringement is "willfully calculated to exploit the advantage of an established mark" or where the defendant is "attempting to gain the value of an established name of another." *Id.* at 1405–06 (citations omitted). Courts have routinely granted summary judgment against plaintiff's request for disgorgement when the plaintiff has failed to raise a genuine dispute

38

about willfulness. *See, e.g.*, *Hydramedia Corp. v. Hydra Media Grp., Inc.*, 392 F. App'x 522, 522–23 (9th Cir. 2010) (finding district court did not err in granting summary judgment as to willfulness and profits where "[d]efendant was not trading off [p]laintiff's name" and "[d]efendant's infringement was not willful"); *Spin Master, Ltd. v. Zobmondo Entm't, LLC*, 944 F. Supp. 2d 830, 849 (C.D. Cal. Mar. 7, 2012) ("Plaintiffs have not raised a genuine dispute over willfulness for disgorgement purposes and summary adjudication of this theory is warranted.").

### a. AAA's Dispute Regarding Definition of Willfulness

As an initial matter, although a showing of willfulness is clearly required by *Stone Creek, Inc.* and *Lindy Pen Co.*, AAA disputes what showing is necessary for willfulness. *See* Opp'n at 23–25. In particular, AAA cites to cases regarding the two recognized theories of consumer confusion that support a claim for trademark infringement: forward confusion and reverse confusion. *Id.* at 23–25 (citing *Marketquest Grp., Inc. v. BIC Corp.*, 862 F.3d 927 (9th Cir. 2017); *Dreamwerks Prod. Grp. v. SKG Studio*, 142 F.3d 1127 (9th Cir. 1998); *Quia Corp. v. Mattel, Inc.*, No. C 10-1902 JF (HRL), 2011 WL 2749576 (N.D. Cal. Jul. 14, 2011)). "Forward confusion occurs when consumers believe that goods bearing the junior mark came from, or were sponsored by, the senior mark holder." *Marketquest Grp., Inc.*, 862 F.3d at 932 (citation omitted). "[R]everse confusion occurs when consumers dealing with the senior mark holder believe that they are doing business with the junior one." *Id.* (citation omitted). Relying specifically on the reverse confusion theory, AAA emphasizes that in the case of reverse confusion, typically "neither junior nor senior user wishes to siphon off the other's goodwill." *Id.* (citing *Dreamwerks Prod. Grp.*, 142 F.3d at 1130). Therefore, AAA argues that because it now plans to bring a reverse confusion theory, AAA can show willfulness in the disgorgement context based only on GM's *knowledge* of AAA's mark at the time of infringement and that GM's knowledge is demonstrated by AAA's April 17, 2017 public launch or May 5, 2017 cease and desist letter. Opp'n at 23–24.

The Court finds that AAA has incorrectly interpreted the law on willfulness in the disgorgement context. In particular, the cases on which AAA relies are likelihood of confusion cases (which is part of the liability inquiry), not disgorgement cases. *See, e.g.*, *Marketquest Grp.,*

39

*Inc.*, 862 F.3d at 932–935 (analyzing likelihood of confusion for purposes of finding trademark infringement); *Dreamwerks Prod. Grp.*, 142 F.3d at 1130 (same). Moreover, these cases do not even address the issue of disgorging a defendant's profits. As such, the Court finds these "likelihood of confusion" cases have no applicability in the Court's disgorgement analysis.

Moreover, AAA has identified no authority, nor has the Court found any, where a court has disgorged a defendant's profits in a reverse confusion case based only on mere knowledge. Further, AAA has identified no authority, nor has the Court found any, where a court has disgorged a defendant's profits in *any* case based only on mere knowledge. AAA has conflated what is sufficient for purposes of likelihood of confusion at the liability stage with what is sufficient to find "willfulness" in the disgorgement context at the remedies stage. Indeed, the Ninth Circuit's decisions in *Stone Creek, Inc.* and *Lindy Pen Co.*, emphasize that in order to prove willfulness so as to be entitled to disgorgement of profits, a plaintiff must show that the infringement is "willfully calculated to exploit the advantage of an established mark" or that GM is "attempting to gain the value of an established name of another." *Lindy Pen Co.*, 982 F.2d at 1405–06. Mere knowledge, therefore, is not sufficient.

Further, the Court's independent review of the case law indicates that AAA cannot rely on a reverse confusion theory to disgorge GM's profits. For instance, several cases suggest that because reverse confusion cases do not involve an intent to exploit an existing mark, reverse confusion cases are not entitled to a finding of willfulness under *Lindy Pen Co.*, and thus to infringer's profits. *See, e.g.*, *Scat Enters., Inc. v. FCA US LLC*, No. CV 14-7995-R, 2017 WL 5896182, at *2 (C.D. Cal. Jun. 8, 2017) ("Plaintiff is barred as a matter of law from seeking disgorgement of Defendant's profits under its reverse confusion theory."); *Novadaq Techs., Inc. v. Karl Stroz GmbH & Co. K.G.*, No. 14-cv-4853-PSG, 2015 WL 9028123, at *2 (N.D. Cal. Dec. 16, 2015) ("An intent to exploit an existing mark 'is necessarily absent in a reverse confusion case,' and *Lindy Pen* thus precludes an accounting of profits." (citation omitted)); *id.* at *3 ("Novadaq correctly notes that this court's interpretation generally shields defendants in reverse confusion cases from having to disgorge their profits. But *Lindy Pen* clearly holds that an accounting of

40

profits from an infringer requires willful exploitation of the plaintiff's mark."); *see also Sands, Taylor & Woods Co. v. Quaker Oats Co.*, 978 F.2d 947, 961 (7th Cir. 1992) (stating that intent to trade on a good will or reputation "is necessarily absent in a reverse confusion case"). Therefore, AAA has incorrectly interpreted the law on willfulness in the disgorgement context.

### b. AAA Fails to Point to Evidence Supporting a Finding of a Genuine Issue as to Willfulness

Pursuant to the Ninth Circuit's decisions in *Stone Creek, Inc.* and *Lindy Pen Co.*, in order to prove willfulness so as to be entitled to disgorgement of GM's profits, AAA must show that GM's infringement is "willfully calculated to exploit the advantage of an established mark" or that GM is "attempting to gain the value of an established name of another." *Lindy Pen Co.*, 982 F.2d at 1405–06.

The Court finds that GM is entitled to summary judgment on willfulness and disgorgement of profits. First, GM argues that it is entitled to summary judgment as a matter of law because GM acted with a reasonable, good faith belief that it owned prior rights in the MAVEN GIG mark. *See San Miguel Pure Foods Co., Inc. v. Rama Inter. Corp.*, 625 F. App'x 322, 325 (9th Cir. 2015) ("Infringement is not willful if the party reasonably believes that its usage of a trademark is not barred by law." (citing *Int'l Olympic Comm. v. San Francisco Arts & Athletics*, 781 F.2d 733, 738 (9th Cir. 1986)). In support, GM persuasively identifies evidence demonstrating that GM's pre-existing plan to announce MAVEN GIG was not impacted by AAA's public announcement of its GIG car share service and that GM "did not, and do[es] not, consider AAA's GIG Car Share to be relevant to [GM's] Maven Gig business as the two businesses have different geographic footprints, use cases, and customers." *See* Mot. at 22 (citing Bhattacharya Decl. ¶ 37; Stooke Tr. at 117:22–24; Bhattacharya Tr. at 205:24–206:18). Moreover, the evidence shows that when GM originally selected the MAVEN GIG mark in September 2016, GM had no knowledge of AAA's mark, nor could GM have knowledge because AAA did not select its GIG mark until January 27, 2017 and did not begin using GIG in commerce until April 17, 2017. Courts in the Ninth Circuit routinely grant summary judgment on the issue of willfulness where the undisputed facts

1  demonstrate that the defendant selected the disputed mark without knowledge of the plaintiff's

2  mark. *See, e.g.*, *Scat Enters., Inc.*, 2017 WL 5896182, at *2 (granting defendant's motion for

3  summary judgment on the issue of disgorgement and explaining that defendant had no knowledge

4  of plaintiff's mark when it launched the disputed mark); *Blau v. YMI Jeanswear, Inc.*, No. CV 02-

5  09511 FMC (SHSx), 2004 WL 5313967, at *6 (C.D. Cal. Jan. 2, 2004) ("At the time Defendants

6  selected the "YMI lets UBU" slogan, Defendants had no knowledge of Plaintiff's trademark of

7  any products labeled U.B.U."); *Groupion, LLC v. Groupon, Inc.*, 859 F. Supp. 2d 1067, 1081–82

8  (N.D. Cal. 2012) (same).

9      In its opposition, AAA fails to "set forth specific facts showing that there is a genuine issue

10  for trial," Fed. R. Civ. P. 56(e), because AAA fails to set forth any facts showing that GM's

11  infringement is "willfully calculated to exploit the advantage of an established mark" or that GM

12  is "attempting to gain the value of an established name of another." *Lindy Pen Co.*, 982 F.2d at

13  1405–06. Indeed, AAA cites to AAA's April 17, 2017 public launch and May 5, 2017 cease and

14  desist letter to support the fact that GM had knowledge. *See* Opp'n at 24–25. However, as already

15  discussed, evidence of mere knowledge is insufficient to show willfulness in the disgorgement

16  context. Moreover, "the failure to stop using a mark after receiving a cease and desist letter does

17  not show willful infringement and is not necessarily indicative of bad faith." *Groupion, LLC v.

18  Groupon, Inc.*, 826 F. Supp. 2d 1156, 1165 (N.D. Cal. 2011) (citation omitted).

19      AAA next asserts that "[s]ince launching the MAVEN GIG services, GM has not made

20  efforts to correct statements made by third-parties referring to the service as something other than

21  MAVEN GIG, including third parties' reference to the MAVEN GIG services as simply 'Gig,'

22  and [has] continued to use the MAVEN GIG Mark despite knowledge of this confusion." *Id.* at 25

23  (citing Bowler Decl., Exs. 63 & 83). However, AAA does not cite to evidence showing that GM

24  failed to correct statements made by third parties. Indeed, the only evidence that AAA cites are

25  two internal GM email summaries of articles that show the media coverage surrounding the May

26  3, 2017 MAVEN GIG announcement. The first email, dated May 4, 2017, contains a bullet point

27  list of articles and hyperlinks, including a bullet point stating: "Android Headlines: Maven's New

28

Gig Service Allows Uber Drivers to Rent Chevy Bolts." Bowler Decl., Ex. 63. The second email,

dated May 9, 2017, contains the "GM Daily News Digest," with summaries of articles about GM,

including an article stating that GM launched "a new program last week called Gig." *id.*, Ex. 83.

These internal GM emails with summaries of MAVEN GIG media coverage do not create a

genuine issue on willfulness because these GM emails do nothing to support a finding that GM

attempted to exploit the advantage of AAA's GIG mark or that GM attempted to gain the value of

AAA's GIG name. *See Lindy Pen Co.*, 982 F.2d at 1405–06.

Accordingly, having found that AAA fails to demonstrate the existence of a genuine issue

of material fact as to willfulness, the Court GRANTS GM's motion for summary judgment on

willfulness. Therefore, AAA cannot disgorge GM's profits. *See, e.g.*, *Hydramedia Corp.*, 392 F.

App'x at 522–23 (finding district court did not err in granting summary judgment as to willfulness

and profits where "[d]efendant was not trading off [p]laintiff's name" and "[d]efendant's

infringement was not willful"); *Spin Master, Ltd. v*, 944 F. Supp. 2d at 849 ("Plaintiffs have not

raised a genuine dispute over willfulness for disgorgement purposes and summary adjudication of

this theory is warranted."); *Scat Enters., Inc.*, 2017 WL 5896182, at *2 (granting summary

judgment when defendant plaintiff "failed to proffer any evidence demonstrating that [d]efendant

willfully infringed its 'Scat' mark"); *Groupion, LLC*, 859 F. Supp. 2d at 1081–82 (granting

defendant's motion for summary judgment on plaintiff's request for defendant's profits where

plaintiff failed to submit any evidence of willful infringement); *Blau*, 2004 WL 5313967, at *6

(granting summary judgment on profits when plaintiff did not provide "sufficient evidence to raise

a triable issue of fact as to whether [d]efendants willfully infringed [p]laintiff's mark."), *aff'd*, 129

F. App'x 385 (9th Cir. 2005).

### 2. There is No Evidence that AAA Has Experienced Actual Damages

GM next argues that it is entitled to summary judgment on actual damages because there is

no evidence that AAA has experienced any actual damages as a result of GM's use of the

MAVEN GIG mark. Mot. at 20, 23–25. The Court agrees.

"Section 35 of the Lanham Act, 15 U.S.C. § 1117(a), governs the award of monetary

remedies in trademark infringement cases and provides for an award of . . . any damages sustained by the plaintiff." *Lindy Pen Co.*, 982 F.2d at 1405. To recover actual damages in a trademark infringement case, a plaintiff must prove "the fact and the amount of damage" *Id.* at 1407. "Damages are typically measured by any direct injury which a plaintiff can prove, as well as any lost profits which the plaintiff would have earned but for the infringement." *Id.* Compensatory damages must be established with "reasonable certainty" and not be based on speculation or conjecture. *McClaren v. Plastic Indus., Inc.*, 97 F.3d 347, 361 (9th Cir. 1996) (citations omitted). The Ninth Circuit has recognized that claims for damages under the Lanham Act may be properly disposed of on summary judgment. *See Committee for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 823 (9th Cir. 1996) (finding that the district court was correct to grant summary judgment on the claim for damages in trademark case because plaintiff failed to create a genuine issue of material fact as to its actual damages); *see also Strike It Rich, Inc. v. Joseph Schlitz Brewing Co.*, 505 F. Supp. 89, 91 (D.D.C. 1980) (finding that defendant's motion for partial summary judgment should be granted in service mark infringement case when the plaintiff repeatedly "failed to provide this Court or defendant with any proof of damage that could be tested or studied," but allowing claim for injunctive relief to stand).

The Court finds that GM has met its burden of "identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact" on the question of actual damages. *See Celotex Corp.*, 477 U.S. at 323. GM identifies evidence in the record where AAA repeatedly failed to identify damages. First, none of AAA's written responses or documents identify any actual damages. *See* Adkisson Decl., Ex. 46 ("Resp. to GM's 6th Interrogs.") at 1–5. Second, AAA's witnesses testified that they were unaware of any specific instances of consumers downloading the MAVEN GIG app under the mistaken belief that it was AAA's GIG car share app, or vice versa. *See, e.g.*, Voges Tr. at 166:23–167:06, 172:12–173:4, 177:22–178:3; Hetke Tr. at 203:18–204:14, 205:13–23. Third, AAA's damages expert, Scott Phillips, could not identify any evidence of actual damages. For instance, during Mr. Phillip's deposition, Mr. Phillips admitted that he has not seen any evidence that AAA has experienced any

quantifiable damages. Adkisson Decl., Ex. 57 ("Phillips Tr.") at 36:18–24, 38:15–43:22, 44:19–

46:20, 48:6–49:22, 52:10–53:13, 57:4–59:6, 61:7–62:11, 63:4–8, 67:1–68:23, 70:7–72:12. In his

report, Mr. Phillips offers no opinion as to whether AAA has actually experienced any harm;

instead, he only states that AAA *believes* it has been harmed. *See* Adkisson Decl., Ex. 54

("Phillips Rpt.") ¶¶ 36–38 (stating "A3 Mobility believes that it has been damaged"; "A3 Mobility

believes that . . . A3 Mobility may suffer damages in the future"; and "I have not made an effort to

quantify actual damages at this time"). Finally, GM's expert, Ms. Distler, was not aware of any

evidence of actual damages. Distler Rpt. ¶¶ 100, 108 ("From my review of the evidence produced

in this matter, I am not aware of any evidence that supports Plaintiffs' claim that Defendants' use

of the MAVEN GIG trademark resulted in any actual damages to Plaintiffs. To my knowledge,

Plaintiffs did not identify any such instances during fact discovery.").

In its opposition, AAA fails to "set forth specific facts showing that there is a genuine issue

for trial." Fed. R. Civ. P. 56(e). Indeed, AAA devotes only a single paragraph to the issue of actual

damages. *See* Opp'n at 22–23. AAA does not challenge GM's assertions that: (1) AAA did not

identify any actual damages in its discovery responses or documents; (2) AAA's witnesses were

unable to identify any actual damages during their depositions; and (3) AAA's own damages

expert was unable to identify any evidence of actual damages. Further, AAA does not address the

case law cited by GM in support of its motion for summary judgment. Moreover, as discussed

further below, neither AAA's case law nor evidence show a genuine issue for trial.

First, the case cited by AAA, *Villagomes v. Lab. Corp. of Am.*, does not support AAA's

position. *Villagomes v. Lab. Corp. of Am.*, is a case from the United States District Court for the

District of Nevada involving a claim for negligence. 783 F. Supp. 2d 1121, 1128–29 (D. Nev.

2011). In that case, the court declined to enter summary judgment on plaintiff's negligence claim

based on her failure to disclose a computation of damages as required by Federal Rule of Civil

Procedure 26, and instead found that the defendants could raise the issue in a motion in limine. *See*

*id.* By contrast here, GM does not challenge AAA's failure to provide a computation under the

Federal Rules of Civil Procedure. GM argues that AAA failed to provide any evidence of actual

45

damages. *See* Mot. at 23–25. Accordingly, this District of Nevada case is inapplicable.

Second, in a footnote, AAA cites to the only evidence that AAA offers to rebut GM's argument: the declaration of AAA's GIG Car Share President, Jason Haight, in support of AAA's opposition to GM's motion for summary judgment, and a few sentences from the deposition of AAA's witness, Michael Hetke. Opp'n at n.103. AAA cites to these two documents without any elaboration except for AAA's assertion that "[a]lthough AAA has not quantified the precise amount of actual damages suffered, AAA produced testimony in discovery and declaration bearing on harm sustained as a result of infringement." *Id.* This evidence cited by AAA does not create a genuine issue of material fact concerning actual damages.

Specifically, the declaration of AAA's GIG Car Share President, Jason Haight, provides anecdotal examples of Mr. Haight's "belief" that AAA has been damaged. *See* Haight Decl. ¶¶ 44–57. Mr. Haight's conclusory statements are not supported by detailed facts or evidentiary support. To the extent he mentions instances of confusion, Mr. Haight provides no details as to who specifically was confused, when the instance occurred, or how many times that type of confusion occurred. Moreover, as the Ninth Circuit has held "[a] conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997); *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993) ("When the nonmoving party relies on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact.").

Similarly, the Michael Hetke deposition provides a few brief statements suggesting that Mr. Hetke is aware of anecdotal evidence of consumer confusion, but Mr. Hetke also does not provide any supporting factual details or supporting evidence. *See* Hetke Tr. at 189:1–15, 208:3–15. This evidence is conclusory. *See F.T.C.*, 104 F.3d at 1171. The Hetke deposition fails to create a genuine issue of material fact on actual damages.

Accordingly, having found that AAA has presented no evidence creating a genuine issue of material fact on actual damages, the Court GRANTS GM's motion for summary judgment on

46

actual damages. *See, e.g.*, *Color Me Mine Enters. Inc. v. S. States Mktg. Inc.*, No. CV 12-00860-RGK (JCx), 2013 WL 12119715, at *9 (C.D. Cal. Apr. 25, 2013) (granting summary judgment in trademark infringement case on actual damages because plaintiff's evidence and allegations were "simply speculative" and failed to establish with "reasonable certainty" that plaintiff directly experienced actual damages "as a proximate result" of defendant's infringement); *Blau*, 2004 WL 5313967, at *4, *7 (granting summary judgment in trademark infringement case on the issue of actual damages where plaintiff and its witnesses were unable to identify specific accounts or customers that were lost due to defendants' alleged infringement); *Oyster Software, Inc. v. Forms Processing, Inc.*, No. C-00-0724 JCS, 2001 WL 1736382 (N.D. Cal. Dec. 6, 2001) (granting summary judgment in trademark infringement case when expert's report was "insufficient to create a material issue of fact" because it was "entirely speculative on the issue of causation of actual damages"); *see also, e.g.*, *Committee for Idaho's High Desert, Inc.*, 92 F.3d at 823 (finding that the district court was correct in granting summary judgment on damages claim in trademark case because plaintiff failed to create a genuine issue of material fact as to its actual damages); *Strike It Rich, Inc.*, 505 F. Supp. At 91 (finding that defendant's motion for partial summary judgment should be granted in service mark infringement case when the plaintiff repeatedly "failed to provide this Court or defendant with any proof of damage that could be tested or studied"); *Groupion, LLC*, 859 F. Supp. 2d at 1081 (granting summary judgment in trademark infringement suit on actual damages where plaintiff had "no evidence of any actual damages incurred"); *Fed. Agr. Mortg. Corp. v. It's A Jungle Out There, Inc.*, No. C 03-3721 VRW, 2005 WL 3325051, at *11 (N.D. Cal. Dec. 7, 2005) (granting summary judgment in trademark infringement case on actual damages because plaintiff did not present "any evidence of damages or profits, much less damages or profits reasonable attributable to the alleged infringement.").

## IV.    CONCLUSION

For the foregoing reasons, the Court DENIES GM's motion for summary judgment on priority of trademark use. The Court GRANTS GM's motion for summary judgment on willfulness and actual damages.

47

United States District Court
Northern District of California

**IT IS SO ORDERED.**

Dated: March 21, 2019

_Lucy H. Koh_

LUCY H. KOH
United States District Judge

United States District Court
Northern District of California